UNITED STATES ex rel. BROOKFIELD
CONSTRUCTION CO., Inc., and Baylor
Construction Corporation, Plaintiffs,

v.

J. George STEWART, individually and as
Architect of the Capitol, et al.,
Defendants.

Civ. A. No. 2258–64.

United States District Court
District of Columbia.

Sept. 29, 1964.

Ralph J. Temple, Washington, D. C., for the plaintiffs.

Joseph M. Hannon and Alan Kay, Asst. U. S. Attys. for the District of Columbia, for the defendants.

HOLTZOFF, District Judge.

The subject matter presented by this case is the extent of judicial review of executive action. The suit is brought by joint bidders for a Government contract, whose bid, although the lowest, was rejected on the ground that it was not accompanied by a proper bond. The defendants are the Architect of the Capitol, who is the contracting officer, and the members of the House Office Building Commission.[1] The complaint seeks relief in the nature of a mandamus the effect of which would be to compel an award of the contract to the plaintiffs. The matter is before the Court at this time on the plaintiffs' motion for a preliminary injunction, and the defendants' motion to dismiss the complaint.

The salient facts are as follows. On June 1, 1964, the Architect of the Capitol issued an invitation for bids for the construction of an underground garage for the Additional House Office Building in process of erection near the Capitol in Washington, D. C.[2] One of the requirements was that every proposal should be accompanied by a bond for at least ten percent of the amount bid. The offers were to be opened at 3:00 p.m. on July 15, 1964. The two plaintiffs,[3] in a joint venture, submitted a proposal of $11,735,-000. It was accompanied by a bond for only $1,100,000, instead of $1,173,500, as was required by the invitation. This deficiency was due to an inadvertent error on the part of the surety company which wrote the bond. Unfortunately, the plaintiffs did not discover the mistake until the last minute. They immediately communicated with the surety company, and at 3:24 p. m. on July 15, which was shortly after the bids were opened, the surety telegraphed to the Architect of the Capitol increasing the bond to a proper amount. The plaintiffs' proposal turned out to be the lowest, the next bid being $35,000 higher.

On August 10, 1964 the plaintiffs received a notice from the Architect of the Capitol rejecting their bid. This action was taken because of the inadequacy of the bond submitted when the proposals were opened. The conclusion was reached that the insufficiency should not be waived and that the correction made subsequently to the opening of the bids should not be considered. Accordingly the contract was awarded to the next lowest bidder.

The intervening events may be briefly summarized as follows. On July 22, 1964,—a week after the bids were opened—, the Architect wrote to the Comptroller General requesting his views as to whether it was mandatory to exclude the lowest bid because of the deficiency of the bid bond. The Comptroller General answered on August 3, that it would be proper to do so. The Architect, acting pursuant to the direction of the House Office Building Commission, wrote to the Comptroller General again on August 5, in the light of what apparently was deemed to be his somewhat ambiguous advice, and en-

1. The Commission consists of the Speaker and two other members of the House of Representatives, 40 U.S.C. § 175.

2. The building is being erected pursuant to the authority conferred by the Act of April 22, 1955, 69 Stat. 41, 40 U.S.C.A. § 175, 1964 Pocket Parts. This statute authorizes the Architect of the Capitol to cause the building to be constructed subject to the approval of the House Office Building Commission.

3. While nominally the United States is named as the plaintiff and the two parties in interest as relators, for the sake of simplicity the latter will be referred to as plaintiffs.

quired "whether the low bid should be rejected as a matter of law". The Comptroller General replied on August 6th, that the plaintiffs' proposal should be barred. On the basis of this advice and pursuant to the direction of the Commission, the Architect of the Capitol then formally rejected the plaintiffs' bid and awarded the contract to the next lowest bidder.

The plaintiffs requested the Comptroller General to reconsider his ruling. He responded by an elaborate and detailed letter of September 11, adhering to his prior opinion. Government counsel contended at the oral argument that an undesirable practice had occasionally arisen among some bidders of purposely accompanying their offers either by an inadequate bond or by no bond at all in order to be in a strategic position of either curing the defect or abandoning the project after the bids were opened and they were able to perceive what their rivals had proposed. Counsel indicated that in order to eliminate such maneuvers the Comptroller General deemed it necessary to enforce the requirements to the letter even though occasionally hardship might result from an inadvertent mistake on the part of a bona fide bidder. It is not for the Court to pass on the motivation of the Comptroller General's exercise of his discretion. There is no suggestions, however, that in this instance the defect in the bond was due to anything but an innocent error, which the bidders took steps to rectify immediately upon its discovery.

This action was thereupon brought against the Architect of the Capitol, the members of the House Office Building Commission being later joined as additional parties defendant, for relief in the nature of mandamus, to require the defendants to consider the plaintiffs' proposal and to award the contract to the lowest bidder whose offer was responsive to the invitation, i. e., to the plaintiffs. The plaintiffs moved for a preliminary injunction to restrain the Architect from executing a contract with any other person, or from issuing a notification to proceed with the performance of such a contract, if already executed. The defendants countered by a motion to dismiss the complaint on the grounds that the plaintiffs lacked standing to sue and that the complaint failed to state a claim on which relief may be granted. Both motions were argued together.

At the outset it is necessary to consider the scope of the authority of this Court to review executive action, such as was taken in this instance. There seems to be a growing tendency to resort to the courts for relief from governmental acts claimed to be harsh, unjust, inexpedient or undesirable. Such efforts ignore some basic and fundamental principles that are well known but often overlooked in the turmoil of activities of everyday life. Simple and elementary as they are, it appears desirable to recall and analyze them from time to time.

The framers of the Constitution of the United States created a popular form of Government, specifically, to use the technical nomenclature of political science, a representative republic. Sovereignty was lodged in the people of the United States.[4] The powers of the Federal Government were divided among three coordinate branches. The legislative power was delegated to representatives elected for comparatively short terms of years. They were vested with the authority to make laws, as well as with the control of the purse, in order that no money might be expended by the Government except pursuant to appropriations voted by the national legislature. The executive branch was to be headed by the President, likewise elected for a comparatively short period. He executes the laws, conducts foreign relations and is Commander in Chief of the armed forces. The third division is an independent judiciary composed of judges who are not subject to popular election, but hold office by a permanent tenure. Their function is to decide controversies between

4. See the Preamble to the Constitution.

one person and another, and between any person and the Government. None of the three branches is superior to either of the other two. All three are coordinate.

The leading members of the Constitutional Convention of 1787 combined profound scholarship and learning with practical experience. They had a thorough knowledge of history of governments of various types, dating back to the days of antiquity, and were well versed in the literature of political science and cognate subjects. Among the treatises familiar to them and that had an influence on their thinking were Montesquieu's *Spirit of the Laws*, and John Locke's *Second Essay on Civil Government*. Both of these classics developed the theory of separation of powers. One of the outstanding contributions of the Founding Fathers to political institutions was actually to bring into being a popular form of Government in which a separation of powers was a principal feature. It may be interesting to observe that it radically differs from popular governments of the parliamentary type, which had their origin and greatest growth in Great Britain. In a parliamentary form of Government there is no separation between the legislative and the executive branches. In fact the executive is a part of the legislature. The heads of government departments for the time being are the principal members of the majority party that controls the legislative body. In Great Britain, while judges are entirely independent and hold office by a permanent tenure, nevertheless, the leading judicial officer, the Lord Chancellor, is a member of the Cabinet and thus a part of the legislative and executive establishment and of the government in power at any one time.

In the United States supreme power is not vested in the judiciary. The courts are not superior to either of the other two branches of Government and have no power of supervision or control over them. Were the fact otherwise, we would cease to have a popular form of government, but instead would be governed by a group of several hundred Federal judges holding office by permanent tenure. Technically the Federal Government would no longer be a republic but would become an aristocracy. This is not what the Founding Fathers contemplated or created. As it is, the courts may not step in and stay or control executive action unless the executive or administrative officer acts in excess of his statutory authority, or in a manner repugnant to a provision of the Constitution of the United States.

These fundamental theories have often been expressed in different ways. Thus Madison said in *The Federalist*, No. 48:

"It is agreed on all sides, that the powers properly belonging to one of the departments, ought not to be directly and compleatly administered by either of the other departments. It is equally evident, that neither of them ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers."

Chief Justice Taney concretely formulated some of these ideas in Decatur v. Paulding, 14 Pet. 497, 515, 10 L.Ed. 559. He stated:

"The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given to them."

Mr. Justice Holmes enunciated a similar thought in Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971:

" * * * it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

Chief Justice Stone, when an Associate Justice, eloquently discussed this subject in his dissenting opinion in United States v. Butler, 297 U.S. 1, 78, 87, 56

S.Ct. 312, 325, 328, 80 L.Ed. 477, 102 A.L.R. 914:

" * * * while unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint."

* * * * * *

"Courts are not the only agency of government that must be assumed to have capacity to govern."

While these statements are found in a dissenting opinion, there appears to have been no difference of views as to these basic principles, the disagreement between the majority and minority being only in their specific application.

This Court had occasion to consider and apply some of these doctrines in another aspect in Trimble v. Johnston, D. C., 173 F.Supp. 651.

■■■■ These fundamental propositions lead to the corollary that the judicial branch of the Government may not be vested with any powers that are not judicial and that the authority of the courts is limited to determining actual and justiciable cases and controversies. The Federal courts may not render advisory opinions, Hayburn's Case, 2 Dall. 408, 1 L.Ed. 436; Muskrat v. United States, 219 U.S. 346, 361, 31 S.Ct. 250, 55 L.Ed. 246; Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 259 et seq., 53 S. Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191; Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239 et seq., 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000. For example, the authority to declare statutes unconstitutional is not a plenary power that is exercised *in vacuo*, as Chief Justice Marshall demonstrated with the precision of an Aristotelian syllogism in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60. If a justiciable controversy is presented to a court and the case may be governed both by a statutory provision and by a clause in the Constitution, and the former is found to be repugnant to the latter, the court must determine the controversy in accordance with the Constitutional provision, and ignore the statute, since the Constitution is the supreme law of the land. The statutory provision is then a nullity insofar as that case is concerned. Necessarily under our system of jurisprudence the case becomes a precedent for future controversies involving the same questions. See also Chicago & G. T. Railway Co. v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176. Similarly, in order to secure a determination by a court, the party bringing the matter to its attention must have a standing to sue. In other words, he must be personally aggrieved or affected in the legal sense by the action of which he complains. A person may not submit a question to the courts for decision if his interest is no different from that of any other citizen, for then there exists no justiciable controversy, Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S. Ct. 300, 82 L.Ed. 374.

■■■■ The Supreme Court crystallized the application of these principles in connection with the authority of the Courts vis-a-vis the executive officers of the Government in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. That case involved a dispute concerning the construction of a contract made with a Government agency. It was claimed in behalf of the contractor that the agency was violating his contract rights. The Supreme Court held that the courts may not step in and either stay or compel executive action unless the executive official was acting in excess of his statutory authority or transgressed a Constitutional limitation. The mere fact that he might be acting erroneously or perhaps even tortiously does not vest the courts with jurisdiction to interfere.

■■■■ In addition, there are several well known subordinate principles. The Government may not be sued except by its consent. The United States has not submitted to suit for specific perform-

ance or for an injunction. This immunity may not be avoided by naming an officer of the Government as a defendant. The officer may be sued only if he acts in excess of his statutory authority or in violation of the Constitution for then he ceases to represent the Government.

 In the case at bar it cannot be said that the various Government officials involved are acting illegally or in excess of their statutory powers. In its ultimate analysis, the plaintiffs' real complaint in its essence is that the Government officers are too rigid and inflexible in applying the pertinent rules of law and in declining to make an exception and relieve the plaintiffs of the harsh consequences of an inadvertent error which they promptly tried to rectify. The plaintiffs are in effect asking this Court to require the defendants and the Comptroller General to exercise a certain degree of leniency toward them in a spirit of sweet reasonableness. This is a tempting and alluring invitation because the result to the plaintiffs seems harsh and, in addition, the Government loses $35,000 as a result of the adamant attitude of the Comptroller General. We must be guided, however, by the implications of Chief Justice Stone's sage admonition that the only check upon the courts' exercise of power is their "own sense of self-restraint", United States v. Butler, supra. The Court has no such dispensing power as the plaintiffs would have it invoke. For the Court to interject itself in a manner sought by them would contravene the principles that we have just discussed. It would be an unwarranted assumption of a power to control and supervise executive action—an authority that the courts do not possess. Since the defendants have done nothing that is illegal or in excess of their statutory authority, the courts with their limited power have no authority to interfere.

 In this connection it seems desirable to give some consideration to the role of the Comptroller General in a situation of the type presented here. The Comptroller General is the head of the General Accounting Office, 31 U.S.C. § 41. Unlike heads of most departments and establishments of the Government, he occupies a dual position and performs a two-fold function. First, he makes investigations of matters relating to the receipt, disbursement and application of public funds, and reports the results of his scrutiny to the Congress with appropriate recommendations. In addition he pursues investigations that may be ordered by either House of Congress, or by any Committee of either House, in matters relating to revenue, appropriations or expenditures, 31 U.S.C. § 53. In performing these functions the status of the Comptroller General is that of an officer of the legislative branch of the Government. The Congress has comprehensive authority to undertake investigations in aid of legislation, or in connection with the appropriation of funds. Investigations are an aid to legislation and to the making of appropriations and are therefore auxiliary to the basic functions of the Congress. The Congress may conduct investigations either through Committees or through an official such as the Comptroller General.

The Comptroller General has also a second status as the chief accounting officer of the Government. His second principal function is that of approval or disapproval of payments made by Government departments and other agencies, as well as of settling and adjusting accounts in which the Government is concerned, 31 U.S.C. § 71. This is an executive function and in performing it the Comptroller General acts as a member of the Executive branch of the Government. The dual status of the General Accounting Office is not anomalous, for many regulatory commissions fulfill in part a legislative function and in part carry out executive duties, Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611. Cf. Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160. Thus we have developed in comparatively recent years a fourth type of Government agency,—

one that combines two kinds of basic powers.

The office of Comptroller General examines all vouchers and scrutinizes all payments made by Government disbursing officers. In case any payments are found excessive, improvident, or illegal, the accounts of the disbursing officer may be surcharged accordingly. The Comptroller General may also transmit such items to the Department of Justice with a view to bringing judicial proceedings in order to secure refunds from persons to whom erroneous payments have been made. The Comptroller General is not a law officer. He does not render legal opinions. His decisions are binding and conclusive only on the Executive branch of the Government, particularly on disbursing officers.

 As a matter of convenience, the Comptroller General may render advance rulings on questions whether certain payments, if made, would or would not be approved by him, 31 U.S.C. § 74, 3d paragraph. Such a course is conducive to fairness and efficiency. While the statute expressly authorizes the Comptroller General to do so, it would seem that even in the absence of an explicit provision such an activity would impliedly be within his functions. Technically a decision of the Comptroller General upon a question so submitted to him, is not a legal opinion, but a ruling or an announcement that if certain payments were made by disbursing officers in the future, they would be passed or disallowed. The disapproval would be binding and conclusive on the disbursing officer but not upon the person to whom the payment might be made. It would still be open to the latter to contest any claim for refund and interpose any defense that he may have. If the disbursing officer on the basis of the advance ruling of the Comptroller General declines to make a payment, it is open to the claimant to pursue a judicial remedy by way of a suit for money damages either in the Court of Claims or in an appropriate United States District Court, as the case may be.

Applying these principles to the case at bar, the decision of the Comptroller General in this instance is equivalent to an announcement that if the contract were made with the plaintiffs, he would disallow any payments that might be made by any disbursing officer thereunder. As a practical matter, no disbursing officer would make any such payments in the face of this ruling. To be sure, it would still be open to the plaintiffs to bring suit against the United States in the Court of Claims for any amount claimed to be due under the agreement. It was proper and prudent, however, for the Architect of the Capitol, acting under the direction and supervision of the House Office Building Commission, to decline to enter into a contract under such circumstances, because it would be undesirable and inexpedient to take a step that might tie up a large Government building project in litigation. As a matter of fact, in light of the ruling of the Comptroller General the plaintiffs would be buying a lawsuit if the contract were awarded to them.

This Court may not set aside the decision of the Comptroller General, first, because it is not erroneous as a matter of law, but merely refuses to make an exception to a rigid rule; and also, because no justiciable controversy is presented, since theoretically the Comptroller General's ruling is in its legal effect merely an announcement that he would disallow any payments under any contract based on the plaintiff's bid. By ineluctable logic the conclusion inescapably follows that this Court may not interfere and require a reconsideration of the plaintiffs' bid.

 In addition, the plaintiffs are confronted with a procedural obstacle. The rule of law requiring Government contracts to be let to the lowest responsible bidder after advertising, has been held to exist solely for the advantage of the Government, rather than for the benefit of prospective bidders. A disappointed bidder has no standing to sue in order to secure an award of the contract

to him, Perkins v. Lukens Steel Co., 310 U.S. 113, 126, 60 S.Ct. 869, 84 L.Ed. 1108; Friend v. Lee, 95 U.S.App.D.C. 224, 227, 221 F.2d 96.

The motion of the defendants to dismiss the complaint is granted.

The motion of the plaintiffs for a preliminary injunction is denied.