**AMERON, INC., Plaintiff,**

v.

**U.S. ARMY CORPS OF ENGINEERS, Lt. Col. Michael K. Collmeyer, Contracting Officer, United States of America, and Spiniello Construction Company, Defendants.**

No. 85–1064.

United States District Court,
D. New Jersey.

March 27, 1985.

Theodore Botter, Meyer and Landis, Newark, N.J., for Ameron Inc.

Charles Tiefer, Deputy Gen. Counsel to the Clerk, Steven R. Ross, Gen. Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk, for plaintiff-intervenors, Speaker and Bipartisan Leadership of the U.S. House of Representatives.

Morgan Frankel, Asst. Senate Legal Counsel, Michael Davidson, Senate Legal Counsel, Washington, D.C., for plaintiff-intervenor, U.S. Senate.

Edward G. Spell, Asst. U.S. Atty., Deputy Chief, Civ. Div., Newark, N.J., for the U.S. Army Corps. of Engineers.

Edward G. D'Allessandro, Brian Mahoney, D'Allessandro, Sussman, Jacovino & Mahoney, Florham Park, N.J., for defendant Spiniello Const. Co.

Robert Murphy, Harry Van Cleve, for Comptroller General, Washington, D.C., as amicus curiae.

## MEMORANDUM OPINION

HAROLD A. ACKERMAN, District Judge.

THE COURT: Had the conscientious secretary who started this controversy with one little dab of correctional fluid known what would ensue, I wonder whether she would have ever taken that first typing course.

The plaintiff in this action, Ameron, Inc., was the lowest bidder on a pipe-cleaning project for West Point Military Academy. Ameron's bid was $1,033,000. The next lowest bid was submitted by Spiniello Construction Company with a bid of $1,255,000. Ameron's bid was, however, rejected by the Army Corps of Engineers as "nonresponsive" and the contract was awarded to Spiniello.

After filing protests with the Corps and the U.S. General Accounting Office (GAO), Ameron applied to this court for an Order to Show Cause why defendants should not be preliminarily restrained from performing the contract in question until plaintiff's protest is decided by the GAO, and for temporary restraints pending the Order to Show Cause.

On March 4, 1985, I issued an Order to Show Cause, but denied the restraints. On March 7, 1985, Ameron returned to this court with an amended request for temporary restraints, bringing to the court's attention the newly enacted Competition in Contracting Act, specifically, 31 U.S.C. Section 3553(d)(1) (1984). A temporary restraining order was entered and defendants were ordered to appear on March 18, 1985 for a hearing.

Following issuance of the TRO, motions to intervene were received from the Speaker and Bipartisan Leadership Group of the House of Representatives and from the U.S. Senate. Leave was also sought by the Comptroller General of the United States to file a brief of amicus curiae. These motions were all granted because of the importance of the issues presented, the interest of those parties therein, and the timeliness of their application. The Supreme Court has also stated "that Congress is the proper party to defend the validity of a statute when [the Executive Branch argues] that the statute is inapplicable or unconstitutional." *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 2778, 77 L.Ed.2d 317 (1983). The extensive briefing done by these parties has been a great help to the court.

On March 18, 1985, oral argument was held on these issues, and I ordered a 10-day extension of the original restraining order for good cause shown pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. I have now had an opportunity to review all the briefs and affidavits submitted by the parties and have researched the significant constitutional issues raised by this controversy, and I am ready to make my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. I note, however, that time constraints have prevented me from dealing with this problem in a more thorough and scholarly manner.

## FINDINGS OF FACT

The U.S. Army Corps of Engineers, New York District, invited bids for a project known as Raw Water Line Improvements. The Project entails cleaning and lining underground pipes which feed the reservoir at the United States Military Academy at West Point, New York.

The bids were opened on January 9, 1985, and, as stated before, Ameron submitted the lowest bid. After the bids were opened, upon request of the Corps, Ameron furnished a letter on January 10th confirming its bid. Ameron also furnished bank references to the Corps and a subcontractor's plan by letter of January 21, 1985. Ameron's subcontract plan was approved by the Corps on January 28th. A letter was drafted for signature of defendant, Michael K. Collmeyer, Deputy District Engineer of the Corps, accepting Ameron's bid for the contract.

When these bids were reviewed by Lorraine Lee, attorney-advisor with the Office of Counsel, it was determined that plaintiff's bid was defective because the penal sum contained in the bid bond had been altered. The numerals "3" and "000" in the millions and the thousands boxes designating the maximum amount of the bond were typed in over white typing correction fluid.

Based upon this revelation and her knowledge of the law, this bid was deemed nonresponsive and rejected because the alteration was not accompanied by any indication that the surety had consented to be bound to this change.

Indeed, in Ms. Lee's affidavit, she stated that a question was raised as to whether the figure in the million(s) box was added before or after the surety's signature. Because of Ameron's failure to submit a responsive bid as required, its bid was rejected and the contract was awarded to Spiniello Construction Company, the next lowest bidder.

By letter dated February 20, 1985, the U.S. Corps of Engineers articulated its reasons for rejecting plaintiff's bid as follows:

"The bid bond submitted by your firm has the penal sum of the bond typed over in white typing correction fluid. Since the bond was not accompanied by any evidence that the surety consented to this alteration, your bid is hereby rejected as non-responsive."

The bond did indeed contain a figure which was later whited out and changed, but this was done by Jan Keating, an employee of Ameron, before the bid bond was signed. When Ms. Keating originally typed the bond, she typed $1.2 million as the maximum amount of the bond. That figure was given to her on her worksheet as the estimated contract price to be submitted by Ameron. Before removing the bid bond from her typewriter, she remembered that she had been asked to type $3,000,000 as the maximum amount of the bond. Therefore, using a small sheet of correct-o-type whiting material, she struck over the "1" and "2" and typed "3" where the "1" was, and typed a "0" where the "2" was. The bond was then signed by Helen Smith, attorney-in-fact for Federal Insurance Co., and by Scott F. Biondi, Eastern Sales Manager of Ameron. Neither of them noticed the alteration in the bond.

On Friday, March 1, Ameron's attorneys filed a protest with the United States General Accounting Office. The protest was sent by electronic means and was received by GAO on March 1. A copy of the protest

was also sent by telecopier to the Corps in New York City on March 1, 1985. Despite this notice and notice given verbally to Ms. Lee on March 1 of Ameron's protest and request that the Notice to Proceed not issue, the Corps issued its Notice to Proceed to Spiniello on March 4.

On March 7, 1985, plaintiff applied for and obtained an Amended Order to Show Cause stating that pursuant to 31 U.S.C. Section 3553(d)(1), the U.S. Army Corps of Engineers was required to suspend activities related to that contract during the pendency of the protest before the General Accounting Office. Ameron contends that the court's rejection of its bid was arbitrary, unreasonable and contrary to law and applicable regulations. It further asserts that the public will suffer irreparable injury if the contract to Spiniello is not enjoined or set aside.

The United States contends that the decision of the U.S. Army Corps of Engineers rejecting plaintiff's bid as nonresponsive was clearly rational and lawful, and must therefore not be disturbed by this court. It also contends that the stay provisions of 31 U.S.C. Section 3553 relied upon by this court in issuing its restraining order are unconstitutional.

I now turn to these contentions.

Before any discussion of the numerous issues briefed by the parties, I note that this case is presently before me on a motion for a preliminary injunction.

In order to prevail in its request for preliminary injunctive relief, Ameron must meet its burden of showing the following: (1) that there is a reasonable likelihood of success on the merits of this litigation; (2) that it will suffer irreparable injury unless the requested relief is granted; (3) that the granting of relief will not substantially harm other interested parties; and (4) that, if the relief is granted, the public interest will not be harmed. *Cerro Metal Products v. Marshall*, 620 F.2d 964, 972 (3d Cir. 1980); *Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980).

Plaintiff's first argument is that the Army Corps of Engineers erred as a matter of law in rejecting their bid based on a typographical correction. They contend that the legal principle is firmly established that a typographical correction of a contract made before its execution and delivery does not invalidate the contract. Plaintiffs also contend that the typographical correction did not violate any rule, regulation, law or bid requirement.

This court's role in this matter is, however, not that of a court seeking to review a contract, nor is it a determination of whether I would have awarded the bid to Ameron or not. This court's role in reviewing agency procurement decisions is extremely limited. The Third Circuit stated in *Princeton Combustion Laboratories v. McCarthy*, 674 F.2d 1016 at 1021 (3d Cir. 1982):

"We hold that as a matter of law, once the district court ... determines that an agency's procurement decision is rational, its inquiry is at an end: the district court must deny the motion for a preliminary injunction...."

Ameron must make a threshold showing that an agency's decision is clearly illegal, or at least irrational, before a court can interfere with the decision-making process. As the Third Circuit has stated:

"A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief." *Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir.1979).

Thus, I turn to an examination of the basis for defendant's decision to reject Ameron's bid. The Corps deemed plaintiff's bid nonresponsive because the alteration of the bid bond was not accompanied by any indication that the surety had consented to be bound by the change. The regulations of the Corps, and decisions of the Comptroller General, consider the bid bond to be a material part of a bid. Case authority from the office of the Comptroller General states that a bid is nonresponsive where it is accompanied by an altered bid bond without evidence of the surety's consent to be

bound by the change. See, e.g., *Montgomery Elevator Co.*, B–210782, 83–1 CPD para. 400 (1983); *Baucom Janitorial Service, Inc.*, 82–1 CPD para. 356 (1982).

The Comptroller General in *Montgomery Elevator* explained the reasons for such a regulation:

"An invitation's requirement for a submission of a bid bond involves a matter of responsiveness with which there must be compliance at bid opening and not later. The reason, in part, is that if the situation were otherwise, a bidder who failed to submit a valid bond could decide after bid opening whether or not to cause its bid to be rejected by submitting or refusing to submit the bond. *See* 38 Comp.Gen. 532 (1959).

"The submission of a materially altered bond can have the same effect as the failure to submit a bond altogether, because under surety law no one incurs a liability to pay a debt or to perform a duty for another unless expressly agreeing to be bound. An alteration in the bond thus raises a question whether the surety agreed to the altered terms. *See* 44 Comp.Gen. 495 (1965). A material alteration to a bond, such as in the penal amount, made without the surety's consent, discharges the surety from liability, 3A C.J.S. *Alteration of Instruments* Section 46 (1973), and a material alteration thus necessarily raises a question whether the surety has any obligation under the bond."

The Comptroller General, in responding to arguments substantially similar to those made by plaintiff here, stated:

"The protester's argument would permit the circumvention of the principle that a bidder should not be able to determine after bid opening whether to have its bid rejected by either submitting or refusing to submit a valid bond. As this case pointedly shows, a bidder's own employee may have a power-of-attorney to execute bonds on behalf of the surety or may be in a position to influence the surety's decision whether or not to disavow an altered bond.

"The purpose of a bond is to secure the liability of a surety to the government in accordance with the terms of the bond, so that the question presented in cases where bonds do not comply with invitation requirements is whether the government obtains the same protection in all material respects under the bond actually submitted as it would under a bond complying with the requirement. *See General Ship and Engine Works, Inc.*, 55 Comp.Gen. 422 (1975), 75–2 CPD 269. As stated above, a surety is discharged from liability on a bond if a material term of the bond was altered without its consent, and an altered bond, without contemporaneously-furnished evidence that the surety agreed to the altered terms, simply does not afford the government the desired protection. The burden on the bidder to submit evidence of agreement, or to prepare a new bond, is slight, and is not enough to justify endorsing a situation with the potential for bidders to submit altered bonds and then determine after bid opening whether to have their bids rejected."

It was based on her knowledge of the considerations described by the Comptroller General and the general procurement law embodied in the *Montgomery Elevator* decision and others that Ms. Lee determined that Ameron's bid was nonresponsive.

■ I simply cannot find that such a determination is irrational. The decision to reject Ameron's bid was clearly justified by rational, established principles. Thus, my inquiry concerning the *merits* of plaintiff's protest must be at an end. See *Princeton Combustion* at 1022. As plaintiff has not shown a likelihood of success on the merits in this regard, there is no need to turn to the question of irreparable injury at this point.

I have, however, been called on to review not only the merits of plaintiff's protest, but the procedure under which that protest is to be evaluated. Ameron has asked this court to stay further action on a government contract pending a recommendation on plaintiff's bid protest by the GAO based

on the *Competition in Contracting Act* ("CICA"), Pub.L. No. 98–369, 98 Stat. 494 (1984). CICA was enacted as Title VII of the Deficit Reduction Act of 1984, Sections 2701–2753. 130 Cong.Rec. S 8422, H 7128 (June 27, 1984).

CICA resulted from more than a decade of study of waste and inefficiency in government procurement. See, e.g., Commission on Government Procurement, *Report of the Commission on Government Procurement* (1972) (submitted to Congress pursuant to Pub.L. No. 91–129 (1969)); H.R.Rep. No. 1157, 98th Cong.2d Sess. 10–17 (1984).

The Congress determined that effective and efficient government procurement required legislation "to increase the use of competition in government contracting and to impose more stringent restrictions on the awarding of noncompetitive-sole-source-contracts." H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1421 (1984), reprinted in 1984 U.S.Code Cong. & Ad.News, pp. at 697, 2109.

Subtitle D of CICA, 98 Stat. 1199–1203, establishes a statutory procurement system "which codifies and strengthens the bid protest function currently in operation at the General Accounting Office." H.R. Conf.Rep. No. 861, *supra*, at 1435, U.S. Code Cong. & Admin.News 1984, at 2123, including an expeditious procedure for the Comptroller General to decide protests filed by interested parties to solicitations for proposals for government procurement contracts and to awards or prospective awards of such contracts. 31 U.S.C.A. Section 3551–3552.

The Comptroller General is to resolve protests by issuing a decision "whether the solicitation, proposed award, or award complies with statute and regulation." 31 U.S.C.A. Section 3554(b)(1). If the Comptroller General upholds a protest, he issues recommendations to the contracting agency as to whether the agency should recompete the contract, terminate the contract, award a lawful contract, or take other actions to promote compliance with the law. *Id.* The Comptroller General's views are recommen-

datory only. Contracting agencies are required to report to the Comptroller General, for transmittal to Congress, instances in which they failed fully to implement the Comptroller General's recommendations. *Id.,* Section 3554(e). In addition, the Comptroller General may award a successful protester its costs of pursuing the protest, including attorneys' fees, and of preparing the bid and proposal. *Id.,* Section 3554(c).

The statute establishes a timetable for the Comptroller General's resolution of protests, generally within 90 working days, unless circumstances warrant use of an "express option" limited to 45 calendar days, or require a period longer than 90 working days. *Id.,* Sections 3553(b), 3554(a)(1) and (2). The Comptroller General may dismiss a frivolous protest as soon as he determines that it "does not state a valid basis for protest." *Id.,* Section 3554(a)(3).

CICA includes automatic "stay provisions." Pending the resolution of a bid protest, the contracting agency is prohibited from awarding the contract, or, if the contract has been awarded, from permitting performance by the contractor, *Id.,* Sections 3553(c)(1), 3553(d)(1), unless the head of the agency makes "a written finding that urgent and compelling circumstances which significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General," or, in the case of an awarded contract, "that performance of the contract is in the best interest of the United States," *Id.,* Sections 3553(c)(2), 3553(d)(2).

When President Reagan signed CICA into law, he "object[ed] to certain provisions that would unconstitutionally attempt to delegate to the Comptroller General ... duties and responsibilities that ... may be performed only by officials of the Executive Branch." 20 Weekly Comp.Pres.Doc. 1037 (July 18, 1984). The President "instruct[ed] the Attorney General to inform all Executive Branch agencies as soon as possible with respect to how they may comply with the provisions of this bill in a

manner consistent with the Constitution." *Id.*

The advice of the Attorney General is contained in an October 17, 1984 memorandum from the Office of Legal Counsel of the Department of Justice that concludes that the bid protest stay provisions are unconstitutional and should not be enforced by executive agencies. The memorandum does not contest the constitutionality of the automatic stay provisions themselves, but only the fact that the Comptroller General's resolution of a protest would operate to lift the stay, potentially earlier than or later than 90 days. *Id.* at 15. The Department analogizes this variance in the length of stays to a "legislative veto" provision. *Id.* Based upon its conclusion that the authority to vary the length of the stay was inseverable from the stay provision itself, the Department opined that the entire stay provision should be invalidated. *Id.* at 16–18.

The Attorney General notified the President of the Senate and the Speaker of the House of Representatives on November 21, 1984, pursuant to the requirements of Section 203(a) of Pub.L. No. 98–411, 98 Stat. 1545, that the Department of Justice had instructed federal agencies not to execute the bid protest provisions. Based upon the opinion of the Department of Justice, the Director of the Office of Management and Budget instructed all executive agencies on December 17, 1984 to "proceed with the procurement process as though no [stay] provision were contained in the Act." OMB Bulletin No. 85–8, at 2.

The bid protest provisions of CICA became effective on January 15, 1985, and plaintiff attempts to enforce the stay provision of that act, 31 U.S.C. Section 3553(d) (1984), by bringing this preliminary injunction. The defendants have resisted application of CICA's stay provisions in this regard, contending that this provision is unconstitutional. However, defendants request the court to avoid deciding the constitutionality of the Act, contending there is an alternative ground for decision.

It is axiomatic that a court will not decide a constitutional question where alternative grounds for the decision exist. *See, e.g., Clay v. Sun Ins. Office Limited,* 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960); *Alma Motor Co. v. Timken-Detroit Axle Co.,* 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128 (1946); *Lamb Enterprises, Inc. v. City of Erie,* 286 F.Supp. 865 (W.D.Pa. 1967), *aff'd* 396 F.2d 752 (3d Cir.1968).

I turn then to defendant's proposed alternative ground for decision.

31 U.S.C. Section 3553(d)(1) provides for a suspension of any activity related to the performance of a contract where a protest has been filed in a timely fashion. This in effect stays further activity related to that particular procurement. Defendants contends, however, that pursuant to General Accounting Office Reg. 21.9(a), the stay pursuant to 31 U.S.C. Section 3553(d)(1) is lifted unless the court assuming jurisdiction of the protest specifically requests a decision by the General Accounting Office. That regulation provides as follows:

"The General Accounting Office will dismiss any protest where the matter involved is the subject of litigation before a court of competent jurisdiction, unless the court requests a decision by the General Accounting Office. The General Accounting Office will dismiss any protest after the matter involved has been decided *on the merits* by a court of competent jurisdiction.

Defendant contends that it is clear from the above provision that once this court declined to request that GAO render a decision, the protest *must* be dismissed inasmuch as the above language is mandatory. That being the case, the stay under CICA is automatically lifted because there is no longer a protest pending before the GAO.

This reasoning ignores both the present posture of this case before the court and the purpose of GAO Reg. 21.9(a).

I am not ruling in any way on the merits of plaintiff's protest. Both 31 U.S.C. 3553 and the law expressed in procurement decision cases such as *Princeton Combustion, supra,* and *Sea-Land Service, supra,* evi-

dence a preference for allowing the Comptroller General and the GAO to decide the merits of a protest, and not the court. Reg. 21.9(a) envisions the GAO dismissing a protest after the matter "has been decided *on the merits* by a court of competent jurisdiction." I have not made and will not make any ruling on the merits of plaintiff's protest.

Reg. 21.9(a) sensibly only refers to a decision on the merits as the regulation is based on an election of remedies principle: if a protester chooses to litigate the merits in district court, instead of before the General Accounting Office, the GAO will not expend its resources issuing useless recommendations. The regulation does not contemplate that contracting agencies would, by deliberately violating CICA, force protesters to file suit to obtain compliance with the CICA provisions.

■ Accordingly, the regulation does not apply to situations such as this in which there has been no voluntary election of remedies. The contrary interpretation would insulate executive agencies' disregard of CICA from judicial review.

The decisions of the Comptroller General cited by defendant to support its interpretation of Reg. 21.9 stress that the GAO will not consider the merits of a protest where the material issues are before a court and that court has not expressed interest in obtaining GAO's views. See, e.g., *Douglass Industries, Inc.*, B–215727, 84–2 CPD, para. 212 (1984); *Joule Maintenance Corp.*, B–212753, 84–1 CPD, para. 128.

It is clear from the posture of this case that this court is interested in obtaining GAO's views on this matter. The court would not issue a stay pending review of the merits by GAO unless the court expected the GAO to render a decision in accordance with 31 U.S.C. Section 3551 et seq.

Moreover, under the terms of 31 U.S.C. Section 3552, the duty to decide bid protests that CICA imposes upon the Comptroller General is mandatory. The Comptroller General does not have the statutory authority to dismiss a protest unless it "is frivolous or . . ., on its face, does not state a valid basis for protest." 31 U.S.C. Section 3554(a)(3). Thus, to the extent that 4 C.F.R. Section 21.9 could be interpreted to require the Comptroller General to dismiss a protest that has not been withdrawn, merely because of the filing of a suit such as this, the provision would be contrary to law and could not be applied.

Thus, Reg. 21.9 does not obviate the need for this court to decide the constitutional issue presented.

■ There is also no reason to treat this case as a suit for injunctive relief under the Administrative Procedure Act ("APA").

The plaintiff's CICA claim takes precedence over plaintiff's APA claim, because the APA authorizes judicial review of only those "agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. Section 704 (1982). As long as plaintiff's protest is pending before the Comptroller General, it has an adequate remedy through the court's enforcement of CICA. Therefore, unless plaintiff were to dismiss its CICA claim, or the court were to invalidate CICA, the merits of plaintiff's protest would not properly be before the court, but only before the Comptroller General.

In the statutorily required notification to the Senate that the Department of Justice was instructing executive agencies not to comply with the stay provisions of CICA, the Attorney General of the United States stated: "[T]he Department's decision to advise Executive Branch agencies not to execute the unconstitutional provisions will best assure a rapid and definitive judicial resolution of these constitutional issues. Any bid protester who is aggrieved by an Executive agency's failure to comply with these provisions may raise the constitutional issues for judicial resolution." Letter from Attorney General William French Smith to Vice-president George Bush, November 21, 1984, at 10. The Acting Deputy Attorney General recently reiterated that the goal of achieving "a speedy judicial resolution of this question" underlay the Department's directive that agencies disobey the law. See, Prepared Statement

of Acting Deputy Attorney General D. Lowell Jensen Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations Concerning competition in Contracting Act of 1984, March 7, 1985, at 10.

In spite of these assurances, the litigating posture of the executive defendants in this case seems to be one designed to avoid a judicial resolution of the lawfulness of agencies' conduct in continuing to disobey the law. This court rejects defendants' attempt to insulate their actions from judicial review. It is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

▌ I turn then to the question of whether the provision of CICA which allows the Comptroller General to lift stays by rendering decisions on bid protests is constitutional.

I note at the outset that consideration of whether "to declare an Act of Congress unconstitutional ... is the gravest and most delicate duty that th[e] Court is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147–48, 48 S.Ct. 105, 106–07, 72 L.Ed. 206 (1927) (Holmes, J., concurring). "Every possible presumption is in favor of the validity of a statute." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 355, 56 S.Ct. 466, 487, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *The Sinking Fund Cases*, 9 OTTO 700, 718, 99 U.S. 700, 718, 25 L.Ed. 496, 504 (1878)).

Defendant contests the CICA provision at issue because it vests in the Comptroller General, a legislative official, executive powers which result in the alteration of legal rights, duties and relations of persons outside of the legislative branch and is therefore inconsistent with the separation of powers principle. *INS v. Chadha, supra*, 103 S.Ct. at 2764.

Plaintiff contends that CICA is constitutional because the Comptroller General is an "Officer of the United States" as that phrase is used in the Appointments Clause,

Art. II, Section 2, cl. 2, of the Constitution. Thus, he may perform all duties that Congress may statutorily assign officers of the United States.

Before turning to the law concerning the separation of powers and the roles of executive and legislative officers, I think it would be helpful to quote extensively from Judge Holtzoff's opinion in *United States v. Stewart*, 234 F.Supp. 94 (D.D.C.1964), *aff'd* 339 F.2d 753 (1964), who I think described the office of the Comptroller General very correctly and thoroughly:

"In this connection it seems desirable to give some consideration to the role of the Comptroller General in a situation of the type presented here. The Comptroller General is the head of the General Accounting Office, 31 U.S.C. Section 41. Unlike heads of most departments and establishments of the government, he occupies a dual position and performs a two-fold function. First, he makes investigations of matters relating to the receipt, disbursement and application of public funds, and reports the results of his scrutiny to the Congress with appropriate recommendations. In addition, he pursues investigations that may be ordered by either House of Congress, or by any committee of either House, in matters relating to revenue, appropriations or expenditures, 31 U.S.C. Section 53.

"In forming these functions, the status of the Comptroller General is that of an officer of the legislative branch of the government. The Congress has comprehensive authority to undertake investigations in aid of legislation, or in connection with the appropriation of funds. Investigations are an aid to legislation and to the making of appropriations and are therefore auxiliary to the basic functions of the Congress. The Congress may conduct investigations either through committees or through an official such as the Comptroller General.

"The Comptroller General has also a second status as the chief accounting officer of the government. His second principal function is that of approval or disapproval of payments made by government depart-

ments and other agencies, as well as of settling and adjusting accounts in which the government is concerned, 31 U.S.C. Section 71. This is an executive function, and in performing it the Comptroller General acts as a member of the Executive Branch of the government. The dual status of the General Accounting Office is not anomalous, for many regulatory commissions fulfill in part a legislative function and in part carry out executive duties, *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 [ (1935) ]. Cf. *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 [ (1926) ]. Thus we have developed in comparatively recent years a fourth type of government agency,—one that combines two kinds of basic powers." *Stewart* at 99–100.

In turning to the separation of powers issue, I repeat Justice Burger's statement in *INS v. Chadha, supra,* 103 S.Ct. at 2781:

"[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787." *Buckley v. Valeo, supra,* 424 U.S. 1 at 124, 96 S.Ct. 612 at 684, 46 L.Ed.2d 659 (1976). Just as we relied on the textual provision of Art. II, Section 2, cl. 2, to vindicate the principle of separation of powers in Buckley, we find that the purposes underlying the Presentment Clauses, Art. I, Section 7, cls. 2, 3, and the bicameral requirement of Art. I, Section 1 and Section 7, cl. 2, guide our resolution of the important question presented in this case. The very structure of the articles delegating and separating powers under Arts. I, II and III exemplify the concept of separation of powers."

And at p. 2784: "The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

"Although not 'hermetically' sealed from one another, *Buckley v. Valeo, supra,* 424 U.S., at 121, 96 S.Ct., at 683, the powers delegated to the three branches are functionally identifiable. When any branch acts, it is presumptively exercising the power the Constitution has delegated to it. See *Hampton & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)."

As the determinative issue in determining whether the Comptroller General is violating the doctrine of separation of powers in carrying out his duties under CICA is whether the Comptroller General is a legislative or an executive officer, I turn to the seminal cases on that question.

In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the U.S. Supreme Court in reviewing the constitutionality of the appointment process of the Federal Election Commission reviewed at great length the nature of legislative and executive functions, and what was constitutionally required of an officer who carried out executive functions. The Court first quoted in full the Appointment Clause, Art. II, Section 2, cl. 2 of the Constitution, and then stated: "We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by Section 2, cl. 2, of that Article." *Buckley* at 126, 96 S.Ct. at 685.

The Court, after deciding that any officer who is carrying out executive duties must be appointed by the Executive, invalidated part of the Federal Election Campaign Act of 1971's provisions, because some of the members of the Commission who were exercising law enforcement functions were appointed by Congress and not the Executive. The court in dicta, explicitly approved the Comptroller General's functioning as an executive officer, stating: "Appellee Commission has relied for analogous support on the existence of the Comptroller

General, who as a 'legislative officer' had significant duties under the 1971 Act. Section 308, 86 Stat. 16. But irrespective of Congress's designation, Cf. 31 U.S.C. Section 65(d), the Comptroller General is appointed by the President in conformity with the Appointments Clause. 31 U.S.C. Section 42." *Buckley* at p. 128 fn. 165, 96 S.Ct. at 686 fn. 165.

The court distinguished the constitutionality of giving legislative officers executive duties from the constitutional practice of giving executive officers legislative powers. The Court cited *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), in which it was said:

"Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive." *Id.*, at 202, 48 S.Ct. at 482. *Buckley*, 424 U.S. at 136–137, 96 S.Ct. at 690–691.

The functions of the Comptroller General in ensuring that contracts are awarded in accordance with the law is then constitutional as the Comptroller General is appointed by the Executive and therefore may exercise law enforcement functions.

The statutory scheme challenged here by defendants is substantially similar to that challenged in *Humphrey's Executor v. U.S.*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). In that case President Roosevelt fired the Commissioner of the Federal Trade Commission before his tenure had statutorily expired. The executors of his estate had brought suit to recover the income not paid to Humphrey from the point of his firing until the statutory expiration of his term. The Justice Department opposed Humphrey, urging that as Humphrey performed functions such as the resolution of claims against the government—functions that may constitutionally only be performed by officials appointed by the Executive—then Humphrey must also be subject to removal by the Executive. This attempt to tie the appointment and function of an officer into the right of removal is also attempted here by defendants.

The Court in *Humphrey's Executor* found the FTC Commissioner's quasi-judicial and quasi-legislative role constitutional, stating at p. 629, 55 S.Ct. at 874:

"We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named. The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will."

The court then described the FTC in terms that I find directly on point for the determination of the GAO's status:

"The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative. Like the Interstate Commerce Commission, its members are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'" *Id.* at 624, 55 S.Ct. at 872 (citations omitted).

The court explicitly approved of the Congressional creation of "a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other

official or any department of the government." *Id.* at 625–626, 55 S.Ct. at 872–873.

Thus, the role of the Comptroller General as described in CICA is not constitutionally infirm due to the fact that it exercises authority over the Executive Branch and is independent of the Executive Branch.

Lastly, I turn to a consideration of *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Supreme Court's last pronouncement concerning the constitutional separation of powers. In *Chadha*, the Supreme Court held that the section of the Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate a decision of the Executive Branch to allow a particular deportable alien to remain in the United States, is unconstitutional because the action by the House pursuant to that section is essentially legislative and thus subject to the constitutional requirements of passage by a majority of both Houses and presentation to the President.

In *Chadha*, the Court struck down the Congressional veto provision because it found that it was essentially legislative in purpose and effect. *Chadha*, 103 S.Ct. at 2784. "The House took action that had the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials in Chadha, all outside the legislative branch." *Id.*

That is not the case here. Just because the Comptroller General's decision is independent of the Executive Branch, it is not then necessarily legislative. Congress enacted the provisions of CICA pursuant to its legislative authority to study various problems in government and enact statutory solutions to correct them. Once the procedures outlined in CICA are enacted, however, Congress has no involvement whatsoever in the procurement process. Congressional influence is completely excluded from the bid protest process, unlike the legislative veto procedure struck down in *Chadha*.

Defendant relies largely on the legislative veto cases, notably *INS v. Chadha*, and on *Buckley v. Valeo*. In these cases, the House of Congress subjected agency operations to political control. In *Chadha*, they did so by a resolution ordering that Mr. Chadha be deported; in *Buckley*, by appointing commissioners of the Federal Election Commission. No such political control exists here.

Indeed, in *Humphrey's Executor*, the Court found it appropriate for Congress to empower agencies to conduct quasi-judicial and quasi-legislative activity. In this regard, *Buckley* reaffirmed the doctrine of *Humphrey's Executor*.

I find that the facts do not bear out defendant's attempt to label the Comptroller General a legislative officer and call his stay function a "legislative veto." Justice Cardozo's observation is entirely on point: "A fertile source of perversion in constitutional theory is the tyranny of labels." See *Snyder v. Massachusetts*, 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934).

I accordingly look past defendant's labels and find the contested statute constitutional.

Having decided that the challenged provisions of CICA are constitutional, it is clear that plaintiffs will prevail on the merits of their claim that no work may go forward until the Comptroller General has either ruled on the merits of plaintiff's protest, or dismissed the protest in accordance with 31 U.S.C. Section 3551 et seq. I therefore must turn to the requirement of irreparable harm.

The provisions of CICA and the question of irreparable harm are inextricably intertwined. I need not dwell on the enormous procurement problems studied in the Congressional hearings and reports spanning more than a decade, for they are widely known, in large part because of those hearings. In fiscal year 1983, the federal government awarded $168 billion in contracts. Although procurement statutes had long favored awards through competitive methods, procuring agencies have persisted in using sole-source acquisition (ac-

quisition from a single supplier, without competition), and other noncompetitive methods. Of that $168 billion "only about one-third, $54 billion, was categorized as competitive." *Competition in Contracting Act of 1984:* H.R.Rep. No. 1157, 98th Cong., 2d Sess. 12 (1984) ("*CICA Report*").

In deciding to enact a stay provision to give the GAO time to examine protests, the House committee holding hearings on CICA was very concerned with *fait accompli* situations where the administrative agency moved ahead with its procurement, in spite of the protest, thereby precluding meaningful judicial review. The committee referred to two opinions in which the court's ability to grant meaningful relief was limited because the agencies had made the challenged awards *fait accompli* in the time it took plaintiffs to get to the courthouse.

In *Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt,* 506 F.Supp. 1059 (D.R.I.1980), the plaintiff filed a protest with the GAO concerning a Coast Guard procurement, but "before the GAO acted upon the protest, the Coast Guard executed the contract with [the protester's competitor]." *Id.* at 1061. The Court cited the procurement regulations discussed above, which required that before making an award "[w]here it is known that a protest against the making of an award has been lodged directly with GAO," approval must be given "at an appropriate level above that of the contracting officer ... [and] a notice of intent to make award in such circumstances shall be furnished GAO...." *Id.* at 1061–62 (quoting regulations). The Coast Guard, evidently not wanting to have an independent opinion on the validity of its action, had not followed that regulation.

In *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 (D.D.C.1982), the plaintiff protested to the GAO concerning a Navy aircraft procurement, but the Navy succeeded in having GAO dismiss the protest as premature. Then, before the plaintiff could protest again, or seek judicial review, the Navy moved ahead with its procurement, apparently trying to present the GAO "with a *fait accompli,*" *id.* at 215, *citing Derecktor, supra.* By such steps, the Navy, "besides making competition impossible, made extremely dangerous any delay that might be occasioned by the judicial process or GAO review." *Id.* at 185 n. 7. In effect, the Navy "had finessed plaintiff's efforts to make a timely protest to the General Accounting Office, and had denied plaintiff an opportunity for timely judicial review of the sole-source decision as to the first 20 aircraft." *Id.* at 185.

The House report noted: "GAO has no power to stop a contract award or contract performance while a protest is pending. As a result, agencies usually proceed with their contracts, knowing that they will preclude any possibility of relief simply by delaying the protest process." *CICA Report, supra,* at 24 (quoting hearing testimony). Congress' solution was to enact the stay provision in 31 U.S.C. Section 3553.

■ I find, therefore, that plaintiffs have made a sufficient showing of irreparable injury in light of the purposes of the Act. The Act specifically provides for a stay such as I am ordering to give the GAO time to review the protest.

I note that the provisions of the Act have a built-in safety valve to prevent undue harm to the United States. Should the head of the procuring activity find that urgent and compelling circumstances which significantly affect interests of the United States be present, work can proceed on the contract in spite of the protest. See 31 U.S.C. Section 3553(c)(2)(A).

I also find that the harm to defendant Spiniello is limited at this point. They have ordered some materials for the project and have organized their work plans and geared up for the project, but no evidence has been presented to demonstrate that any harm greater than a limited monetary investment would ensue if all work were stopped.

I accordingly preliminarily enjoin defendants from going forward with any work

except in accordance with the CICA provisions.