**AMERON, INC.,** Appellee,

and

**United States Senate Thomas P. O'Neill, Speaker of House of Representatives and Bipartisan Leadership Group,**

and

**Charles A. Bowsher, the Comptroller General of the United States,** Intervenors-Appellees,

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Lt. Col. Michael K. Collmeyer, Contracting Officer, United States of America; and Spiniello Construction Company.**

Appeal of **UNITED STATES of America.**

Nos. 85–5226, 85–5377.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1985.

Reargued Sept. 15, 1986.

Decided Dec. 31, 1986.

Rehearing and Rehearing En Banc Denied Feb. 27, 1987.

---

Richard K. Willard, Asst. Atty. Gen., Thomas W. Greelish, U.S. Atty., Newark, N.J., William Kanter, Harold J. Krent (argued), Douglas N. Letter, Appellate Staff, Civil Div., Room 3348, Dept. of Justice, Washington, D.C., for appellant.

Edward D'Allessandro, D'Allessandro, Sussman, Jacovino & Mahoney, Florham Park, N.J., for Spiniello Const. Co.

Theodore I. Botter, Meyner & Landis, Newark, N.J., for Ameron, Inc.

Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel (argued), Asst. Senate Legal Counsel, Office of Senate Legal Counsel, Washington, D.C., for appellee, U.S. Senate.

Steven R. Ross (argued), General Counsel to the Clerk, Charles Tiefer, Deputy General Counsel to the Clerk, Janina A. Jaruzelski, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., for Appellees Speaker and Bipartisan Leadership Group of the House of Representatives.

Harry R. Van Cleve, General Counsel, Robert P. Murphy (argued), Seymour Efros, Ronald Berger, Washington, D.C., for Comptroller General of the U.S. as intervenor-appellee.

Sharon Rae Gross, David S. Cohen, Cohen & White, Washington, D.C., for Computer and Communications Industry Ass'n ("CCIA")—amicus curia on behalf of appellees.

Before BECKER and GARTH, Circuit Judges, and HUYETT,* District Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal from a judgment of the district court for the District of New Jersey is before us on panel rehearing in the wake of the Supreme Court's decision in *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). There the Supreme Court struck down certain provisions of the Gramm-Rudman-Hollings Act as unconstitutional because they violated the doctrine of separation of powers by giving executive powers to an officer in the legislative branch, the Comptroller General of the United States.

Here we are concerned with the constitutionality of the Competition in Contracting Act, enacted as Title VII of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, and codified at 31 U.S.C. §§ 3551–3556 (hereinafter "CICA" or "the Act"). CICA empowers the Comptroller General to issue recommendations to procuring agencies on protests brought by disappointed bidders for federal contracts. Plaintiff Ameron, Inc., invoked those provisions in the course of challenging a con-

---

* Honorable Daniel H. Huyett, 3rd, United States District Judge, Eastern District of Pennsylvania, sitting by designation.

tract award by defendant Army Corps of Engineers (the Army). The Army contends that CICA violates the doctrine of separation of powers because, in aid of his power to recommend resolutions of bid protests, CICA authorizes the Comptroller General to alter the timetable under which the procuring agencies go through the procurement process. The district court disagreed and granted an injunction against the Army, enforcing the provisions of CICA that stay the procurement process. *Ameron Inc. v. United States Army Corps of Engineers*, 607 F.Supp. 962 (D.N.J.1985). This panel modified the scope of the injunction for reasons unrelated to the merits of the constitutional question,[1] but otherwise affirmed the judgment of the district court. 787 F.2d 875 (3d Cir.1986).

*Synar* established that the Comptroller General is a member of the Legislative branch for separation of powers purposes because Congress has the power to remove him by following a procedure less demanding than impeachment. See 106 S.Ct. at 3191. Given the Court's holding in *Synar*, the issue now before us is whether CICA authorizes the Comptroller General to perform functions that constitute "execution of the law in constitutional terms." *Synar*, 106 S.Ct. at 3192. For the reasons that follow we hold that it does not, and again, albeit on grounds different from those we relied upon when the case was first before us, we affirm the district court's conclusion that CICA is constitutional.

## I. THE FACTS GIVING RISE TO THIS LITIGATION

The facts which gave rise to this case are set out in detail in the district court's opin-

ion, 607 F.Supp. at 964–65, and in this panel's earlier opinion, 787 F.2d at 879–80. We review them briefly here for the convenience of the reader.

Plaintiff Ameron, Inc. submitted a bid in response to the Army's "Invitation for Bids" on a sewer repair and cleaning project to be completed at the U.S. Military Academy at West Point. Ameron's bid was the lowest submitted, but the Army did not award Ameron the contract because it believed Ameron's bid bond did not comply with the requirements set out in the "Invitation." Ameron believed that its bid was in compliance, and after the award was announced but before execution had begun, Ameron filed a bid protest with the Comptroller General.

Although CICA requires the executive to stay execution on challenged contracts until the Comptroller General's recommendation is issued, the Army proceeded with execution because it believed the stay provisions unconstitutional. Ameron filed suit in the United States District Court for the District of New Jersey, seeking, inter alia, an order that the Army obey CICA's stay provisions. The Army defended by asserting CICA's unconstitutionality.

The district court found that CICA was constitutional, and it accordingly held that Ameron was entitled to a preliminary injunction enforcing CICA's stay provisions. 607 F.Supp. at 974. The Army then appealed to this court, which affirmed. 787 F.2d at 891. A majority of the panel held in that opinion that the Comptroller General was not an agent of the legislative branch and therefore that it was permissible for Congress to delegate to the Comptroller the power to decide when CICA's stay should be lifted. See 787 F.2d at 885–87.[2]

---

**1.** The order issued by the district court purported to bind the Army to obey CICA throughout the United States. This panel modified that result, holding that as thus granted the injunction was broader than necessary to provide the relief to which the plaintiff was entitled. We therefore altered the order so that it bound the Army only with respect to plaintiff Ameron's bid protest, 787 F.2d at 891. Nothing in *Synar* requires us to decide this question anew, and

indeed, the briefs filed by the parties on rehearing do not discuss the issue at all. We therefore adopt the conclusion and reasoning regarding the proper scope of the injunction set out in Part IV of the panel majority's opinion. 787 F.2d at 887–91.

**2.** The author of this opinion disagreed, and wrote separately. I would have held that the Comptroller General was an agent of the Congress but that his role in CICA did not "threaten

A motion for panel or in banc reconsideration was then filed by the Army. By that time certiorari had been granted in *Bowsher v. Synar*. The court deferred action on the motions pending the Supreme Court's decision in *Synar*.

The Supreme Court's decision in *Synar* was contrary to the reasoning of the panel majority in the first *Ameron* opinion: the Supreme Court held that for separation of powers purposes the Comptroller General must be regarded as an agent of the legislative branch, and therefore that the Comptroller may not exercise any power which Congress itself may not possess. We therefore granted panel rehearing, and received further briefs and oral argument. We now reconsider the Army's challenge to CICA in light of those developments.

## II. CICA'S STRUCTURE AND OPERATION

As the federal procurement process is currently structured, Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent. This discretion is exercised by procurement officers in each federal agency which makes purchases.

The discretion thus delegated is not completely unstructured. In two statutes, the Armed Services Procurement Act, *See* 10 U.S.C. §§ 2301–2324, and the Federal Property and Administrative Services Act, codified in Title 41 of the United States Code, Congress has established procedures which must be followed by procuring agencies, and standards the agencies must adhere to, when they decide what to purchase and on what terms. These procedures and standards are designed to ensure that the government satisfies its needs at prices as low as possible. See 41 U.S.C. § 401(2) (declaring that "[i]t is the policy of the Congress to promote economy, efficiency

and effectiveness in the procurement of property and services by the executive branch of the Federal Government by ... (2) establishing policies, procedures, and practices which will provide the government with property and services of the requisite quality, within the time needed, at the lowest reasonable cost"); Part III of House Comm. on Government Operations, H.Rep. No. 97–71 Accompanying H.R. 3519 (subsequently passed as the Department of Defense Authorization Act of 1982. P.L. 97–86, 95 Stat. 1099) at 9, *reprinted in* 1981 United States Code Cong. & Admin. News 1801 at 1806 (procurement process relies on "competition as the predominant means of getting the most value from federal expenditures").

Among the most important of the policies implemented by these statutes and regulations is the principle that competitive bidding is the favored method of identifying least-cost suppliers. These statutes and regulations permit sole-source contracting (i.e. the letting of a government contract to a supplier picked by the Government without competitive bidding) under some circumstances. See 41 U.S.C. §§ 5, 253(c)–(f); 10 U.S.C. § 2304(a)–(f). But for most procurements competitive bidding is required. 41 U.S.C. § 253; 10 U.S.C. § 2304(a).

Although competitive bidding is supposed to be the way most government purchases are made, Congress has found procuring officials extremely—and increasingly—reluctant to use competitive bidding as the method of choosing sellers. This reluctance to use competitive bidding has been accompanied by rapid growth in the budgets for procuring agencies. In Congressional discussions regarding CICA Representative Brooks, one of CICA's sponsors, observed that

> [w]hile Federal procurement regulations require agencies to award contracts on a competitive basis, inventive procurement officials within the agencies have found

---

to coalesce powers in one branch such that individual liberty ... is threatened." 787 F.2d at 895. I would have upheld CICA's constitutionality on that ground. That approach, how-

ever, was not followed by the Supreme Court in *Synar,* and we accordingly do not pursue it here.

984

numerous ways to circumvent or get around these requirements altogether.... As a result of not using full and open competition, the Government is spending billions of dollars each year in excessive prices for its goods and services.

130 Cong.Rec. H1785 (daily ed. March 20, 1984) (statement of Rep. Brooks). *See also* House Comm. on Gov't Operations, *Report on the Competition in Contracting Act of 1984*, H.R.Rep. No. 1157, 98 Cong., 2d Sess. 11–17 (1984); 129 Cong.Rec. S16005–9 (daily ed. November 11, 1983) (statements of Senators Cohen, Roth, Percy and Levin); Senate Comm. on Gov't Affairs, *Report on the Competition in Contracting Act of 1983*, S.Rep. No. 50, 98th Cong., 1st Sess. 3 (1983); *Management of the Department of Defense, Part 6, Purchasing of Spare Parts and Support Equipment:* Hearings Before the Senate Comm. on Gov't Affairs, 98th Cong., 1st Sess. 1–21 (1983).

After considering the issue in a variety of contexts (especially defense), and after three different bills were introduced to remedy this problem,[3] Congress enacted statutes which used several different tools to compel executive obedience to the Congressional will. First, and perhaps most familiarly to administrative lawyers, Congress established tribunals called boards of contract appeals, which are charged with hearing disappointed bidders' complaints that executive branch officials did not comply with the procurement laws. *See* 41 U.S.C. §§ 601–613. The decisions issued by the boards are binding on procuring agencies. *See* 41 U.S.C. § 607(d) (authorizing boards "to grant any relief that would be available to a litigant asserting a contract claim in the United States Claims Courts").

Congress also sought to compel greater use of competitive bidding by shining the light of publicity on the procurement process, and by creating mechanisms by which Congress can remain informed of the way

current procurement legislation is (or is not) operating. These two goals the legislature has pursued by requiring publicity, and creating offices with the incentive to produce it, in a variety of contexts. Written justifications, approvals and public notices are required when non-competitive procurements are believed necessary. 41 U.S.C. § 253(f); 10 U.S.C. §§ 2304(c)(7)(B), 2310(b). An advocate for competition is established in each agency, responsible for publicizing and challenging barriers to full and open competition. *See* 41 U.S.C. § 418; 10 U.S.C. § 2318. And annual reports to Congress are required describing plans for increasing competition. 41 U.S.C. § 407. Department of Defense advocates for competition must annually inform Congress of their accomplishments during the preceding year. *See* 10 U.S.C. § 2318(c).

Finally, the bid protest resolution process created by CICA is also intended to inform Congress of the operation of existing procurement laws, and to use the pressure of publicity to enforce compliance with those laws. CICA's bid protest procedures enable disappointed bidders to compel the executive to explain some of its procurement decisions to the Comptroller General. Although that official, in turn, is not authorized to alter the executive decisions in any way, he is empowered to recommend action to the procuring agency. If his recommendation is not accepted the Comptroller General must inform Congress about the entire episode in "a report describing each instance in which a Federal agency did not fully implement the Comptroller General's recommendations." 31 U.S.C. § 3554(e)(2).

To ensure that the force of publicity is brought to bear effectively on challenged procurement decisions, and that if that does not work Congress is fully informed about the incident, CICA contains a variety of provisions regarding the timing of procurements challenged by bid protests. The net effect of these provisions is to suspend the procurement process until the Comp-

---

**3.** The three bills were the Competition in Contract Act of 1983, S. 338; the Defense Procurement Reform Act of 1983, H.R. 2545; and the Competition in Contracting Act of 1984, H.R. 5184.

troller General has issued his recommendation.

A less formal version of the CICA's bid protest procedure had been followed for many years prior to passage of the Act. *See Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1313–16 (D.C.Cir.1971). Before CICA, however, when the Comptroller General decided what relief a protesting bidder should receive, he also took into account the cost to the procuring agency of providing the recommended relief. The cost of awarding a contract to a protesting bidder is of course much higher once the contract has already been awarded to another supplier, and work begun on it. Because procuring agencies were often reluctant to adopt the Comptroller General's recommendation, they frequently responded to the filing of a bid protest, or other form of Congressional concern over how certain resources were being purchased, by rushing to award a contract and begin its execution. This prevented the Comptroller General from even recommending relief that would undo what the procuring agency had done or wanted to do.[4] This problem is exemplified by the facts in *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 (D.D.C.1982). See especially *id.* at 215.

CICA is in part a response to this problem. The House Report on CICA explained that, under existing law,

> GAO has no power to stop a contract award or contract performance while a protest is pending. As a result, agencies usually proceed with their contracts, knowing that they will preclude any possibility of relief simply by delaying the protest process.

Competition in Contracting Act of 1984, H.R.Rep. No. 1157, 98th Cong., 2d Sess. 24 (1984). Congress responded to this practice by providing that, barring exigent circumstances, once a bid protest has been filed, a contract cannot be executed until the protest has been resolved. This rule is implemented by § 3553 subsections (c) and (d), and by § 3554(a), of Title 31, United States Code. These provisions are set out in the margin.[5] Finally, CICA also autho-

**4.** *See* House Conference Report No. 98–861 to Accompany H.R. 4170 (subsequently passed as The Deficit Reduction Act of 1984) (June 23, 1984) at 1436, 1984 United States Code Cong. & Admin.News 697, 1445, 2124:

> [CICA is intended] to ensure that if the Comptroller General sustains a protest, such forms of relief as termination, recompetition, or reaward of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's best interest would not be served by relief measures of this sort because of the added expenses involved. [CICA] is designed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

**5.** Section § 3553 provides in relevant part as follows:

> (c)(1) Except as provided in paragraph (2) of this subsection, a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending.
> (2) The head of the procuring activity responsible for award of a contract may authorize the award of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—
> (A) upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General under this subchapter; and
> (B) after the Comptroller General is advised of that finding.
> (3) A finding may not be made under paragraph (2)(A) of this subsection unless the award of the contract is otherwise likely to occur within 30 days thereafter.
> (d)(1) If a Federal agency receives notice of a protest under this section after the contract has been awarded but within 10 days of the date of the contract award, the Federal agency (except as provided under paragraph (2)) shall, upon receipt of the notice immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract. Performance of the contract may not be resumed while the protest is pending.
> (2) The head of the procuring agency responsible for award of a contract may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—
> (A) upon a written finding—

rizes the Comptroller General to order the procuring agency to reimburse bid protesters for the costs they incurred in preparing their bids and/or their bid protests. See 31 U.S.C. § 3554(c).

These provisions do not compel procuring agencies to obey the recommendation of the Comptroller General. Instead, the effect of these provisions is to compel procurement officials to make purchase decisions in light of what the Comptroller General recommends the government do in that case. The Comptroller General's interpretation of the procurement laws has come to be highly respected. *See Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir.1979); *Wheelabrator Corp. v. Chafee,* 455 F.2d at 1313. His recommendations are therefore a persuasive mechanism through which Congress and disappointed bidders can speak to the executive about the way the laws are being executed. The stay provisions at issue in this case compel the executive to listen.

The other effect of the stay provisions, when they operate in tandem with CICA's reporting requirements, is to inform Congress, and thereby the public, of the extent to which the procurement laws are being followed. CICA commands the Comptroller General to decide what relief would be necessary given that the challenged procurement has not yet been made; such remedies can be identified only if the procurement is suspended until the Comptroller General's decision has been issued. CICA also commands the Comptroller General to inform Congress of "each instance in which a Federal agency did not fully implement the Comptroller General's recommendations." 31 U.S.C. § 3554(e)(2). This reporting function provides Congress with the information it wants, including the measures which would have been necessary to make the challenged procurement conform with applicable laws, only if the recommendations made by the Comptroller General are based on how things stood before the procurement had been executed. Given the apparent willingness of procuring agencies to frustrate Congressional inquiry by rushing to complete challenged procurement projects, CICA reflects Congress's decision that the pre-execution facts can be the basis for the Comptroller General's recommendation only if the procurement process is suspended until his recommendation is issued.

## III. ARE THE DISPUTES REGARDING CICA'S STAY EXTENSION AND FEE PROVISIONS RIPE FOR CONSIDERATION BY THE COURT?

### A. *Introduction*

At the outset we address one issue on which the parties have divided only implicitly. The U.S. Senate, as Intervenor-Appellee, suggests that this Court need only decide the constitutionality of the automatic stay provision, under which the procurement process is automatically suspended for ninety days upon the filing of a bid protest. Because the Comptroller General decided Ameron's bid protest within the ninety days provided by the statute, and did not extend beyond that period the time during which the procurement process was

(i) that performance of the contract is in the best interests of the United States; or
(ii) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and
(B) after the Comptroller General is notified of that finding.
Section 3554 provides in relevant part that
(a)(1) [e]xcept as provided under paragraph (2) of this subsection, the Comptroller General shall issue a final decision concerning a protest within 90 working days from the date the protest is submitted to the Comptroller General unless the Comptroller General determines and states in writing the reasons that the specific circumstances of the protest require a longer period.
(2) The Comptroller General shall, by regulation prescribed pursuant to section 3555 of this title, establish an express option for deciding those protests which the Comptroller General determines suitable for resolution within 45 calendar days from the date the protest is submitted.
(3) The Comptroller General may dismiss a protest that the Comptroller General determines is frivolous or which, on its face, does not state a valid basis for protest.

suspended, the Senate argues that we need not decide whether the Comptroller General may constitutionally wield the stay-extending power. The Comptroller General also did not exercise his power, under 31 U.S.C. § 3554(c), to order the procuring agency to re-imburse Ameron for either the cost of preparing its bid protest or the cost of preparing the underlying bid, but there is also some uncertainty among the parties as to whether or not the re-imbursement provision is now before the Court. We analyze the ripeness argument regarding the stay provision and the fee provision separately.

### B. *Ripeness of the Dispute Regarding the Stay Provisions*

A fair reading of the Army's contentions about the constitutional infirmity of CICA requires that we reject the Senate's argument as to the ripeness of the controversy regarding the stay extension provisions. The Army points out that the power to extend the stay affects the operation of the procurement process even when that power is not exercised, because the Comptroller General's ability to threaten an extension of the stay—and his ability to promise that he will decide the protest quickly, or dismiss it as frivolous, and thereby cut the stay short—give the Comptroller General influence over the procurement process which the doctrine of separation of powers forbids him to have so long as he is a member of the legislative branch.

At least in the First Amendment context, it has been held that if the power to threaten to act in a given way influences the exercise of constitutional rights, then the existence of that power can be judicially reviewed as soon as the power is created. The courts need not wait until the threat is made good. *See United States Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 551–54, 93 S.Ct. 2880, 2883–85, 37 L.Ed.2d 796 (1973) (adjudicating challenge to constitutionality of the Hatch Act, which authorized prosecution of government employees who engaged in certain political activities); compare that case with *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), in which the Court declined to adjudicate a similar challenge on ripeness grounds.

■ The doctrine of separation of powers gives each branch of the government constitutional rights. These rights are of tremendous importance, as they insure that our government functions properly. They thereby serve as bulwarks to the freedom which the doctrine of separation of powers is intended to preserve. We accordingly believe that the approach to ripeness adopted in the First Amendment context should also be used in disputes about the applicability of the doctrine of separation of powers. We note that the Supreme Court has adopted a uniquely flexible approach to ripeness in the separation of powers context, which also supports the ripeness result we reach here. See *Buckley v. Valeo*, 424 U.S. 1, 113–18, 96 S.Ct. 612, 679–82, 46 L.Ed.2d 659 (1976).

We note as well that the Army's argument on ripeness is quite similar to the argument in *Synar* regarding the present effect of Congress's statutory power to remove the Comptroller General. On the merits, the defenders of Gramm-Rudman-Hollings argued that Congress's power to remove the Comptroller General did not affect the way the Comptroller General carried out his budget cutting duties because the removal power had never been exercised in the sixty-five years since it was created. The Supreme Court rejected that argument, however, holding that the removal power was relevant even though it had never been exercised. Repeating the explanation given by the district court in *Synar*, the Supreme Court held that "it is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation of powers problems." *Bowsher v. Synar*, 106 S.Ct. at 3189 n. 5, *quoting Synar v. United States*, 626 F.Supp. 1374, 1392 (D.D.C.1986).

Similarly, the Army argues in this case that procurement officers will feel obliged to conduct the procurement process differently after CICA, in an effort to minimize conflict with the Comptroller General, so that the Comptroller General does not have the chance to exercise his stay-extending power. In essence the Army is arguing that the procuring agency's "desire to avoid [conflict] by pleasing" the Comptroller General "creates the here-and-now subservience to another branch that raises separation of powers problems."

■ It is certainly conceivable that the stay provisions create "here-and-now" subservience, as the Army argues. If the Army is right then CICA gives the Comptroller General some power over the procurement process even when he does not exercise the stay-extension authority: the Army is concerned with the Comptroller General's ability to threaten to exercise this power just as it is with his actual use of it. We must therefore decide whether the power to threaten conflicts with the doctrine of separation of powers, for if it does then the Constitution is violated even when the threat is not made good.

### C. *Ripeness of the Fee Provision Issue*

■ In this case the Comptroller General has declined to order Ameron's re-imbursement for either its bid proposal or bid protest preparation costs, and Ameron has not included a claim for such re-imbursement in its complaint. In addition, and unlike the stay extension provisions which are at issue here even though they have not been exercised, no argument is made that the Comptroller General's ability to threaten a procuring agency with a re-imbursement order will enable the Comptroller General to influence executive action even when that power is not actually exercised. We therefore believe that the parties' disagreement regarding the constitutionality of the fee provision is not ripe for judicial review.[6]

### IV. *THE MERITS*

The Army makes three different challenges to CICA's delegation of power to the Comptroller General. It is essential at the outset to separate those arguments, and to point out what the Army does not contend.

The Army does not argue that the Comptroller General may not investigate procurement decisions, or that he may not make recommendations on the basis of his investigation. The Army also concedes that Congress could have passed a law automatically staying the procurement process for a fixed period, commencing with the filing of a bid protest, to allow the Comptroller General to conduct an investigation. Transcript of Oral Argument at 18–19. Instead, the Army's attack focuses entirely on the Comptroller General's authority to shorten the stay if the protester's claim is frivolous or the investigation complete, and to lengthen the stay if more time is necessary to complete the investiga-

---

**6.** We also note that Ameron's bid protest was decided long ago by the Comptroller General, so that Ameron itself will receive no immediate benefit from the decree we issue in its favor in this matter. The case has remained alive, and avoided mootness, only because the dispute presented here is "capable of repetition yet evading review." This is true because the stay to which CICA entitles protesting bidders lasts only a short time, as it takes only a few weeks for the Comptroller General to decide a bid protest. The Reagan Administration has ordered procuring agencies to ignore CICA's stay provisions, *see* Office of Management and Budget Bulletin No. 85–8, *Procedures Governing Implementation of Certain Unconstitutional Provisions of The Competition in Contracting Act of 1984,* but because the right CICA gives protest-

ers lasts so short a time, that right will inevitably expire before the courts can complete review of the executive's failure to comply with the law. See the discussion of mootness in the panel's earlier opinion, 787 F.2d at 880–81.

A dispute about the constitutionality of the bid proposal or protest reimbursement provision, were one to arise, would not suffer from this problem. The Comptroller General's award of costs, if disobeyed by the procuring agency to which it was directed, would give rise to a simple claim for money damages. That claim could be pressed in the courts after it arose, and the party to be reimbursed would benefit immediately and substantially when the claim was upheld even if that outcome took a substantial amount of time.

tion. About this particular power the Army makes several claims.

First, the Army argues that CICA is unconstitutional because of the very fact that the Comptroller General, an agent of the Congress, does the things that CICA orders be done. The Army contends that CICA's delegation of the power to extend or shorten the stay of the procurement process authorizes the Comptroller General to execute CICA. Totally apart from any effect the Comptroller General's actions may have on the procurement process, the Army argues that the provisions of CICA themselves are "laws" and that the Comptroller General's implementation of those provisions is the Comptroller General's "execution of the law" in violation of the doctrine of separation of powers.

Second, the Army argues that CICA impermissibly gives the Comptroller General control over the procurement process, again authorizing the Comptroller General to execute the law. Third, the Army contends that even if these first two arguments are not correct, CICA still gives the Comptroller General excessive influence over the procurement process and thereby authorizes excessive legislative interference in a domain the Constitution assigns to the executive.

In essence, these arguments break down into the contentions that the Comptroller General's authority to extend or shorten the stay usurps executive power *per se*, on the one hand, and on the other hand that it authorizes the Comptroller General to interfere impermissibly in the executive's performance of its responsibilities. *See Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317 (1983) (Powell, J., concurring) (citations omitted) (noting that "[f]unctionally, the doctrine [of separation of powers] may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned functions. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another.") These

two attacks on CICA could be understood to differ from one another only in the degree of usurpation they allege by one branch of another's functions. But applicable precedent has distinguished these two kinds of separation of powers problems. We therefore find it useful to analyze the two contentions separately. We begin with the second of the arguments described by Justice Powell, namely the contention that Congress has usurped a power that properly belongs to the executive. We then discuss the extent to which CICA authorizes congressional interference in executive action.

A. *May the Comptroller General Constitutionally Implement CICA?*

The Army attacks CICA by arguing that the Act authorizes the Comptroller General to engage in "execution of the law in constitutional terms." *Synar,* 106 S.Ct. at 3192. The Army begins this attack by summoning language from *Synar* which it asserts defines executive action:

Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of "execution" of the law. Under § 251, the Comptroller General must exercise judgment concerning facts that affect the application of the Act. He must also interpret the provisions of the Act to determine precisely what budgetary calculations are required. Decisions of that kind are typically made by officers charged with executing a statute.

*Id.* Upon this language the Army bases its contention that the Comptroller General impermissibly executes CICA:

Under CICA, the Comptroller General has been empowered to determine whether a particular protest is "frivolous," whether it "state[s] a valid basis for protest," or whether "the specific circumstances of the protest" require staying performance of the government's contract for longer than the statutory period. 31 U.S.C. § 3554(a)(1)–(a)(3). Because in discharging those responsibilities the Comptroller General "interprets the pro-

visions of the Act" and "must exercise judgment concerning facts that affect the application of the Act" (*Bowsher*, [106 S.Ct. at 3192]) he is executing the law. Therefore, just as the Comptroller General may not discharge the responsibilities vested in him by the Gramm-Rudman-Hollings Act, he cannot exercise the authority drawn in question here, for while his responsibilities may be less extensive here than in *Bowsher*, they are nonetheless executive in nature.

Supplemental Memorandum of the United States Army Corps of Engineers, filed July 29, 1986, at 5–6.

The Army is correct insofar as it presses *Synar*'s holding that an essential part of execution of the law is the interpretation of that law. Certainly the executive cannot execute the law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself. It is for this reason, and to this extent, that "the President's duty to the law often puts upon him the duty to interpret it for the Executive Department." Edward S. Corwin, *The President: Office and Powers, 1787—1984* 141 (5th rev. ed. 1984).

■ The mere fact that a non-executive government official interprets the law, however, does not in and of itself mean that this official infringes on the President's authority to execute the law. *Synar*'s discussion of the "executive nature" of the Comptroller General's authority in that case did not end with the sentences quoted by the Army, but rather focused on the Comptroller's authority under Gramm-Rudman-Hollings to direct the exercise of Presidential authority:

> The executive nature of the Comptroller General's functions under the Act is revealed in § 252(a)(3) which gives the Comptroller General the ultimate authority to determine the budget cuts to be made. Indeed, the Comptroller General commands the President himself to carry out, without the slightest variation (with exceptions not relevant to the constitutional issues presented) the directive of

the Comptroller General as to the budget cut reductions:

> The [Presidential] order *must provide* for reductions in the manner specified in section 251(a)(3), *must incorporate* the provisions of the [Comptroller General's] report submitted under section 251(b), and *must be consistent with such report in all respects.* The President *may not modify or recalculate any of the estimates, determinations, specifications, bases, amounts, or percentages* set forth in the report submitted under section 251(b) in determining the reductions to be specified in the order with respect to programs, projects, and activities, or with respect to budget activities, within an account. . . .

*Synar*, 106 S.Ct. at 3192, quoting § 252(a)(3) of Gramm-Rudman-Hollings (emphasis and bracketed material supplied by the Supreme Court).

Indeed, the Army's suggestion that interpretation of the law by those outside the executive branch infringes on the President's authority to execute the law would render unconstitutional a substantial portion of our constitutional system long thought to be at least permissible and at most constitutionally required. From *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), to *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court has emphasized that the judicial branch has the authority and duty not only to interpret the law but to decide in the final instance of every suit what the law says. The judiciary also applies the law to particular facts, and even issues orders binding on the Executive.

In addition, many laws specifically delegate authority either to the judiciary or to Congress, in the administration of which these branches must interpret the law and may even make binding decisions. *See, e.g.*, 28 U.S.C. §§ 601–11 (granting broad powers to Director of Administrative Office of the U.S. Courts); 2 U.S.C. §§ 601–05 (establishing duties of Congressional Budget Office); 28 U.S.C. §§ 2071–76 (granting

Supreme Court broad powers to make court rules). The Supreme Court has upheld the constitutionality of some of these delegations. *See, e.g., Sibbach v. Wilson & Co.*, 312 U.S. 1, 9–10, 61 S.Ct. 422, 424–25, 85 L.Ed. 479 (1941) ("Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules....") (footnote omitted). We cannot believe that the Supreme Court intended *Synar* to overrule these cases and to make as drastic a change in our constitutional system as the Army's interpretation would suggest.

· We believe that the Army's error stems from its focus on the manner in which the Comptroller General acts to the exclusion of the power he wields. We think instead that *Synar* enjoins us to ascertain whether the power Congress has given the Comptroller General lies outside Congressional authority, or is of a kind which Article II of the Constitution grants exclusively to the President and his subordinates. Such an analysis is also hinted at in *Humphrey's Executor v. United States*, 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935), which distinguishes between the exercise of an executive function, on the one hand, and the wielding of executive power, on the other. Justice Sutherland's opinion in *Humphrey's* explains:

> To the extent that [the FTC] exercises an executive function—as distinguished

from executive power in the constitutional sense—it does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government.

*Id.* (footnote omitted); *see also Synar v. United States*, 626 F.Supp. 1374, 1397 n. 25 (D.D.C.1986) (making the same distinction). Although the manner in which a branch operates will in some senses be related to its power, *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852) (federal courts lack constitutional authority to render advisory opinions), we are ultimately concerned in this case with the kind of power the Comptroller General wields. The true questions before us are whether the Comptroller's actions pursuant to CICA constitute a legitimate exercise of Congressional power and whether, in any event, that exercise usurps power granted exclusively to the President.

1. *Is CICA A Proper Exercise of Congressional Power?*

We first consider whether the Comptroller's actions pursuant to CICA are a legitimate exercise of Congressional authority.[7] In general, Congress has enormous authority to pass laws governing the procurement process. The Army does not contend, and we know of no authority or reason, that Congress could not, through legislation, dictate exactly what the Army must purchase, from whom, and at what price.[8]

---

7. Contrary to Judge Garth's suggestion in his concurrence, *see infra* pp. 1000, 1001 note 2, we believe that the operation of the stay provisions can be understood, and their constitutionality evaluated, only when we know Congress' purpose in creating those provisions and the Act of which they are a part and when we have identified the power Congress was exercising when it passed the Act. Rather than "prejuding" CICA's constitutionality, this inquiry is intended only as the first step in the resolution of that question.

8. Indeed, Congress may also use the power of the purse to restrict executive action of many kinds under existing legislative delegations of authority, including the executive's exercise of prosecutorial discretion and the formulation of litigation strategy. For example, Congress can delete funding for prosecutions of a given kind

pursuant to existing legislation. When the legislature objected to certain enforcement actions brought by the Federal Trade Commission, it instructed the agency to spend no money on such proceedings. See Hearings on H.R. 3685 before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice, 96th Cong. 1st Sess. (1979) (investigating FTC's initiation of proceedings to cancel or restrict the registration of certain trademarks which it believed had become generic); Wall St.J., May 22, 1980, at 5, col. 1 (noting Congress's decision to restrict the Commission's authority to expend funds on cancellation petitions). Similarly, in this case the district court ordered the executive to comply with the stay provisions of CICA, which that court held constitutional. The administration thereafter announced that it would not abide by that decision, but would continue to disobey

The Comptroller General's actions pursuant to CICA, however, do not constitute legislation. *Chadha* recognizes that Congress' authority to legislate, obeying the bicameralism and presentment clauses of Article I, is broader than its authority to act in other ways.

Notwithstanding the limitations on its authority when Congress does not act through legislation, *Chadha,* the courts have long recognized that Congress may legitimately investigate executive and other conduct even when it does not act through legislation. *See, e.g., Kilbourn v. Thompson,* 13 Otto 168, 103 U.S. 168, 26 L.Ed. 377 (1880); *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). That authority flows directly from Congress's authority to pass laws, because of the lawmakers' need to be properly informed. *See Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957). Moreover, in order to investigate, individual Congressional Committees may coerce testimony by issuing subpoenas. They may do so without the concurrence of both houses and without presentment of the question to the President. 2 U.S.C. § 190*l*: Indeed, recognizing Congress's needs for information and for time to legislate properly, the Supreme Court has indicated that the legislature may properly command the executive to stay its actions and report to Congress before proceeding with a specific executive act. *See Chadha,* 462 U.S. at 935 n. 9, 103 S.Ct. at 2776 n. 9, *citing Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941).

Congress also has the power to seek to influence executive action through the force of its opinions. Congress may, and often does, pass concurrent resolutions setting out its views, without presentment to the President. *See* 4 Hinds, *Precedents of the House of Representatives* §§ 3483, 3484 (1907).

Moreover, courts have recognized that Congress may exercise this influence not only through the direct communication of its views but also through the illuminating power of investigation. While "there is no congressional power to expose for the sake of exposure," the Supreme Court has distinguished investigation of that kind from Congressional efforts to "inquire into and publicize corruption, maladministration or inefficiency in agencies of Government." *Watkins,* 354 U.S. at 200 & n. 33, 77 S.Ct. at 1185 & n. 33. In *Bowsher v. Merck & Co.,* 460 U.S. 824, 103 S.Ct. 1587, 75 L.Ed.2d 580 (1983), the Supreme Court even appeared to endorse the lodging of this authority in the hands of the Comptroller General. Construing a statute which altered the scope of the Comptroller General's investigatory powers, the Court recognized that "the two major purposes of the bill were 'to give the Comptroller General the proper tools to do the job the Congress has instructed him to do ... and ... *to provide a deterrent to improprieties and wastefulness in the negotiation of contracts.'* " *Id.* at 833, 103 S.Ct. at 1593; *quoting* 97 Cong.Rec. 13198 (1951) (our emphasis).

Lower courts have come to similar conclusions. As a line of cases in the Court of Claims and the Federal Circuit recognizes, Congressional investigations often affect procurement decisions, and the executive may properly change a procurement decision because of Congressional pressure to do so. *See e.g., City of Alexandria v. United States,* 737 F.2d 1022 (Fed.Cir. 1984); *Schlesinger v. United States,* 390 F.2d 702, 710, 182 Ct.Cl. 571 (1968) (Navy may legitimately terminate a contract un-

CICA's provisions until a "final decision" was rendered by "the courts." Letter from Edwin Meese, III to the Editor, New York Times, May 13, 1985. *But see* 28 U.S.C. § 1291 (defining final order). In response to this announcement the House Judiciary Committee approved legislation which would have eliminated all funding for the Office of the Attorney General until the

administration agreed to obey the district court's order in this case. See H.R. 2348, Department of Justice Appropriation Authorization Act, Fiscal Year 1986, 99th Cong. 1st Sess., and the Report thereon by the House Judiciary Committee, H.R. Rep. 99–113, 99th Cong. 1st Sess. (1986).

der "termination for convenience" clause because of Congressional pressure to do so). In *John Reiner & Co. v. United States*, 325 F.2d 438, 442–43, 163 Ct.Cl. 381 (1963), the Court of Claims also recognized that the Comptroller General properly wields this influence and may persuade the executive about procurement decisions because he represents an "arm of Government properly concerned with the contractual problem." (footnote omitted). As the *Reiner* Court stated, the executive's yielding to Comptroller's influence does not "allow[ ] the Comptroller General to dictate the termination of the contract, but, rather, [is] using termination as a means of minimizing a conflict with" the legislature. *Id.* 325 F.2d at 442.

■ As our earlier discussion of CICA makes clear, that Act permits an agent of the legislature to investigate potential government misconduct in the execution of the procurement laws, and to influence the executive's execution of the laws through the powers of public illumination and persuasion. Congress has authority to accomplish these purposes. Furthermore, as the judicial sanction of report and wait provisions indicates, Congress has authority to delay procurement activity in the pursuit of these goals.[9] *See Chadha*, 462 U.S. at 935 n. 9, 103 S.Ct. at 2776 n. 9. Finally, as the judicial sanction of legislative subpoenas indicates, Congress may properly exercise discretion outside of legislation in deciding how it shall conduct an investigation, even though its subpoenas may have an impact on the executive. Absent a usurpation of executive authority, or an unconstitutional interference with it, the Comptroller's actions pursuant to CICA represent a proper exercise of Congressional authority.

**9.** The stay provision at issue in CICA is not a report and wait provision, because the reports do not necessarily reach Congress (via the Comptroller General's annual summary) until after execution is completed. Often, therefore, legislation based on these reports will come too late to affect the specific executive actions about which Congress receives reports. But if the power to legislate implies the power to command the executive to wait for legislation, then

2. *Do CICA's Stay Provisions Attempt to Authorize the Comptroller General to Usurp the President's Authority to Execute the Laws?*

The President's duty under the Constitution "to take care that the laws are faithfully executed," U.S. Const. Art. II § 3 is accompanied by the grant of "the executive power." *Id.* at § 1. The scope of this power depends on the amount of discretion that law leaves to the executive: in a sense, the power to execute the laws commences where Congress's exercise of the power to legislate leaves off. *See* Jackson, J., concurring in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) ("Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress.") If Congress gives the President only a few general instructions, and allows the executive "to fill up the details," *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825), then the scope of the executive power is great. If, on the other hand, Congress chooses to specify a great number of details concerning how it wants the executive to proceed, such as specifying what it wants the executive to procure, the legislature is entirely free to take that course.

Notwithstanding Congress' authority to define the contours of the power to execute the laws, *Chadha* instructs us that once Congress has delegated authority to the executive, the executive must be allowed to operate freely within the sphere of discretion created for him by that legislation, subject only to challenge for illegality before the courts and the general oversight of Congress. In *Synar*, for example, Con-

we believe that the power to express an opinion on executive action implies the power—absent exigent circumstances—to command the executive to wait until an opinion has been expressed. In the case of CICA, the stay provision serves both to facilitate investigation and to delay executive action until after Congress, through its agent, has had the opportunity to communicate its views.

gress delegated to the President the power to specify certain changes in the budget. Nothing in the Constitution gives the President any power over appropriations except the power to veto appropriation legislation. But the delegation of power at issue in *Synar* made the changes in the budget a matter of executive discretion, subject to certain prescribed standards. The constitutional infirmity recognized by the Supreme Court was that, having delegated that power to the President, Congress then obliged the President to exercise that discretion according to the dictates of the Comptroller General, an agent of the legislature, without any change in the underlying legislation. *Synar*, 106 S.Ct. at 3192.

■ Unlike the contentions advanced in *Synar*, however, the Army does not argue that in passing CICA Congress gave power to the executive and then took it back, and upon examination such a contention would clearly be untenable. Unlike Gramm-Rudman-Hollings, CICA itself does not give the executive any substantive powers. The only grant of power to the executive in CICA is the right, under certain circumstances, to override the ninety day stay or any extension thereof which the Comptroller General might impose. CICA does not grant any authority to the Comptroller General to dictate how the executive utilizes that authority to override the stay.

Because CICA does not allow Congress to wield powers that have been given to the executive, either by the Constitution itself or in the delegation in CICA, the Comptroller General's actions under CICA alone do not constitute "execution of the law in constitutional terms."

### B. *Does CICA Authorize The Comptroller General To Execute The Procurement Laws?*

There is, of course, another delegation of power to the executive at issue here: that is the delegation of authority to operate the procurement process, i.e. to buy goods and

services on behalf of the government. The Army argues that CICA impermissibly gives the Comptroller General power over the procurement process because the Comptroller General's power to determine when—and, by virtue of his power to extend the stay, if—an acquisition takes place, effectively enables him to determine what is bought and on what terms. This panel rejected that proposition when the case was first before us, and we do so again today.[10]

■ Execution of the procurement laws as they are currently structured requires decisions about what ought to be bought when, at what price, and from whom. In deciding whether or not to extend the stay CICA does not authorize the Comptroller General to consider any of these factors. Rather, in deciding whether to extend a stay or terminate it before ninety days have passed, the Comptroller General is authorized to consider only the length of time needed to decide the merits of the bid protest. CICA gives the Comptroller General no power to assess the importance of the acquisition or the wisdom of the purchase decision made by the procurement officer. And of course, the Army does not contend that CICA empowers the Comptroller General to initiate any purchase decisions. Rather, like a court, the Comptroller General is authorized to act only in those cases which other parties submit for decision.

Further, CICA authorizes the executive to override the stay under limited circumstances. Before a purchase decision has been made the statute permits override of the stay if "urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." 31 U.S.C. § 3552(c)(2)(A). When a bid protest is filed within ten days after a purchase decision has been made, the stay may be overriden if "performance of the

---

**10.** See 787 F.2d at 887 ("Congress has given the Comptroller General no ultimate veto over government appropriations.")

contract is in the best interests of the United States" or if the "urgent and compelling circumstances" test set out above is satisfied. *Id.* at § 3552(d)(2)(A).

Those circumstances are limited, and if the words used by the statute have meaning we assume there would be times when the specified circumstances would be absent, and when the executive would therefore be bound to obey the stay and an extension imposed by the Comptroller General. The Army's decision to override a stay could conceivably even be subject to judicial review, although we do not decide that question today. Even with these limitations on an agency's authority, however, the statutory ability to override the stay provides the Army with significant power to assert its independence and to minimize any abuse of the Comptroller General's limited authority to delay or expedite a procurement decision to the extent necessary to complete an investigation.

Finally, CICA leaves procuring agencies free to refuse to implement any and all of the Comptroller General's "recommendation." If agencies choose not to implement the Comptroller General's recommendations, they are bound only to report their reasons. 31 U.S.C. § 3554(e)(1).

As we have discussed above in Part IV A, Congress has the authority to investigate, and to publish its opinion, in an attempt to influence the manner in which the laws are executed. In upholding the exercises of similar kinds of authority, courts have recognized that the issuance of a subpoena to the executive, the mandate of a report and wait provision, the expression of disapprobation or the focusing of public attention on executive action do not themselves constitute control of executive decisionmaking. *McGrain v. Dougherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Chadha,* 462 U.S. at 935 n. 9, 103 S.Ct. at 2776 n. 9; *Merck,* 460 U.S. 824, 103 S.Ct. 1587. We similarly do not find such control here.

To summarize, we believe that CICA does not give the Comptroller General control over the procurement process for three reasons. First, in deciding whether to extend or shorten a stay the Comptroller General cannot consider anything except the length of time necessary to resolve a bid protest. Second, even if the Comptroller General decides that more time is necessary, the executive need not always obey the Comptroller General's extension of the stay. Third, the executive is free to ignore the Comptroller General's recommendation on the merits of the protest. CICA therefore does not authorize the Comptroller General to execute the procurement laws.

### C. Does CICA Authorize the Comptroller General to Interfere Impermissibly with the Executive's Performance of its Procurement Duties?

Finally, the Army argues that even if CICA does not authorize the Comptroller General to execute the procurement laws, it does empower him to do things that will interfere excessively in the executive's execution of those laws. According to the Army, this interference does not arise from the Comptroller General's investigation, from the Comptroller's recommendation, or even from the existence of a fixed stay provision. Rather, the Army claims that the Comptroller's discretion to shorten the stay if he finds a complaint frivolous or if he completes the investigation early, or to lengthen the stay if the investigator needs more time, will alter the decisionmaking of procurement officials. The Army claims that the Comptroller's discretion will encourage procurement officials to make the kinds of decisions that, through experience, they will come to know minimize the likelihood of lengthy investigations.

As we noted in Part IV A, CICA is an exercise of Congress's power to investigate and its power to publicize and criticize the President's execution of existing legislation. But the fact that Congress has some right to do what it has done does not end our inquiry. Instead, this case presents a potential conflict between the legitimate exercise by Congress of its powers, on the

one hand, and the executive's legitimate exercise on the other hand of the procurement powers which Congress has delegated to the President and which he has in turn delegated to his subordinates in the various procuring agencies.

*United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), provide the standard we must apply in a case such as this one. In *United States v. Nixon* President Nixon claimed, inter alia, that he had a qualified privilege to withhold documents sought by the prosecution in a criminal trial. The Supreme Court recognized that the doctrine of separation of powers required that the President have some ability to maintain the confidentiality of his conversations and correspondence. 418 U.S. at 708, 94 S.Ct. at 3107.

Opposed to this Constitutionally-based claim of confidentiality, however, was the claim of a court in a criminal trial to enforce "the public['s] ... right to every man's evidence." Id. at 709, 94 S.Ct. at 3108. That claim is equally based in the Constitution, in both the Sixth Amendment's guarantee of the right to confront and cross-examine witnesses and in the Fifth Amendment's guarantee that liberty will not be taken without due process. See 418 U.S. at 711, 94 S.Ct. at 3109. Moreover, the Court noted that "[i]t is the manifest duty of the courts to vindicate those guarantees." *Id.*

Facing a conflict between the executive's power to control the secrecy of his work with the courts' power to command the presentation of evidence, the Supreme Court balanced the interests against one another. The Court explained that "we must weigh the importance of the general privilege of confidentiality of Presidential communications in performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice." 418 U.S. at 711–12, 94 S.Ct. at 3109 (footnote omitted). In *Nixon v. Administrator of General*

*Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court elaborated upon this approach to a conflict between the exercise by two branches of their constitutionally assigned functions. There President Nixon challenged the constitutionality of the Presidential Recordings and Materials Preservation Act, which gave the Administrator of General Services control over documents and tape recordings generated by President Nixon and his administration during Nixon's time in office. The former President argued that, because it "delegat[ed] to a subordinate officer of the Executive Branch" the power to decide "whether to disclose Presidential materials," the statute was "an impermissible interference by the Legislative Branch into matters inherently the business solely of the Executive Branch." 433 U.S. at 440, 97 S.Ct. at 2788.

To evaluate this claim the Supreme Court set out a two-part "test:"

[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned function. *United States v. Nixon,* 418 U.S., at 711–712 [94 S.Ct. at 3109–3110]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress. *Ibid.*

*Nixon v. GSA,* 433 U.S. at 443, 97 S.Ct. at 2790. We apply these teachings to the case before us.

First, we acknowledge that procurement officials will go about their business differently after CICA than they did before it. Indeed, that was in part Congress' intention: in passing CICA Congress sought to change practices then prevalent, which Congress believed were wasteful, inefficient, and inconsistent with existing procurement policy. Even apart from the elimination of improper procurement practices, however, we also acknowledge that,

because of CICA, procurement officials may sometimes exercise their discretion in ways which are not required by the procurement laws, and which they would not otherwise have chosen, in order to minimize conflict with the Comptroller General.

■ Even if we were to consider this impact on executive decision making to be a potential disruption of the "proper balance of power," *Nixon v. G.S.A.*, 433 U.S. at 443, 97 S.Ct. at 2790, we believe that a balancing of legislative and executive interests demonstrates that this interference is entirely justified. In *United States v. Nixon* the Supreme Court noted that the disclosure of the President's private papers and conversations might indeed interfere with the President's execution of the law. But the Court deemed this interference justified by the need for such documents in a simple criminal trial, the greater political significance of which played no part in the Court's analysis. In contrast to the intrusion in that case, the intrusion occasioned here by the Comptroller General's discretion to lengthen or shorten the stay is far more limited, and we are certain that the legislative interests underlying CICA prevail. Indeed, for three reasons, we believe that any potential disruption of the executive function is minimal:

1. The initial stay is short. Even if the acquiring agency were to change a procurement decision in order to avoid or to cut short a bid protest, it would not stand to gain so much time that the temptation to do so would have a significant impact on the agency's purchase decision.[11]

2. CICA does not authorize the Comptroller General to extend the stay any longer than necessary to decide a bid protest. We cannot envision circumstances, and none have been suggested to us, when this time could be long enough to constitute a significant impediment to the President's execution of the procurement laws.

3. If the Comptroller General really does require so much time to decide the protest that the stay interferes with important executive interests, CICA authorizes the executive to override the stay.[12] In light of these factors, we simply do not believe that the executive has shown that CICA creates any significant impediment to the President's execution of the law. In fact, we are persuaded that "any intrusion" permitted by CICA upon the executive branch "can only be termed de minimis." *Commodity Futures Trading Comm'n v. Schor*, — U.S. —, 106 S.Ct. 3245, 3260, 92 L.Ed.2d 675 (1986).

Weighing against this limited potential disruption to the executive's activities are the substantial Congressional interests which CICA and its stay provisions effectuate. Congress found that procurement officials' insistence on ignoring the policy in favor of competition in contracting has been a serious problem affecting the way billions of dollars are spent by the government. Congress was not satisfied with the self-policing efforts of the executive branch, and it concluded that the appropriate remedy must include investigation of specific spending decisions. The Comptroller General's discretion to lengthen the stay reflects Congress' determination that the Comptroller be able to finish his investigation while the abuse, if there has been one, is still remediable. The Comptroller's discretion to shorten the stay reflects Congress' desire that procurement activities not be impeded unnecessarily: a desire, essentially, to avoid interfering with the executive. Balanced against the minimal interference, if any, with the executive's activities, we believe the Congressional in-

---

11. The Army does not contend that we should strike the Act down because the Comptroller General might abuse his power under the act, either by arbitrarily offering to terminate the stay early, by dismissing a protest as frivolous, or by threatening to extend the stay for longer than required to decide the protest. *See* Transcript of Oral Argument at 12.

12. The standard governing whether or not the acquiring agency may override the stay varies, depending on whether the protest was filed before or after the contract was awarded. *See* p. 994.

terest justifies CICA and its stay provisions.

More significantly, however, we are convinced CICA effectuates, rather than disrupts, the "proper balance" of power between the executive and legislative branches. It therefore does not even require the balancing interests which is the second step of the *Nixon v. GSA* analysis. *Id.*, 433 U.S. at 443, 97 S.Ct. at 2790. Rather than understanding the stay extension provisions as authorizing interference in the executive's domain, we believe that CICA permits exactly that subtle interplay between the branches which the founders hoped for and which the Constitution fosters. In Federalist 47, Madison explained that, at least in Montesquieu's view, separation of powers does not mean that the three branches ought to have "no *partial agency* in, or no *controul* over the acts of each other. [Montesquieu's] meaning, as his own words import ... can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted." The Federalist Papers, 302–03 (Mentor ed. 1961) (emphasis in original).

Justice Jackson has articulated the same point slightly differently. He observes that

> [w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). *See also United States v. Nixon,* 418 U.S. at 707, 94 S.Ct. at 3107 ("[i]n designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.")

Particularly as they concern the two political branches, these words force us to recognize that, although the President may not legislate except by exercise of his veto power, and although the Legislature may not execute the law, neither is it the case that the President may only execute or veto, and the Congress only pass laws. Rather, "there is a zone of twilight in which [the President] and Congress may have concurrent authority, or in which its distribution is uncertain." *Youngstown,* 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring).[13]

Rather than concentrating power in the legislative branch, CICA diffuses and divides power, giving final control over procurement decisions to the executive but permitting meaningful oversight by an agent of Congress. Like other political mechanisms built on the basis of the doctrine of separation of powers, CICA encourages the branches to work together without enabling either branch to bind or compel the other. That is the way a government of divided and separated powers is supposed to work.

As we discussed above,[14] the judgment of the district court must be altered to

---

**13.** The President has long exercised roles in legislation not set out in the Constitution without challenge that such actions disrupt the function of Congress. Apart from the Presidential veto, the Constitution provides President a role in legislation only by "recommend[ing] to [Congress's] consideration such measures as he shall judge necessary and expedient;" Art. II § 3. But the "zone of twilight" described by Justice Jackson permits the President to be involved continuously in the process of developing legislation. *See* Edward S. Corwin, *The President: Office and Powers, 1787–1984*, 303–17 (5th rev'd

ed. 1984) (describing the extensive role—apart from the veto—which various presidents have played in the development of legislation). Similarly, although the Constitution grants no such authority, the President may summon people to investigate a problem to determine what legislation is necessary. *See* Federal Advisory Committee Act, 5 U.S.C. app. 2, §§ 1–15 (1986) (prescribing procedures to be followed by presidential commissions).

**14.** See n. 1 *supra.*

correct the scope of the injunction. That judgment will therefore be modified, and as modified, affirmed.

GARTH, Circuit Judge, concurring:

When the litigants originally argued this appeal in October 1985, the Army, in challenging the constitutionality of the Competition in Contracting Act, 31 U.S.C. §§ 3551–3556 (CICA), as well as the Senate, the House, and the Comptroller General in seeking to uphold CICA's constitutionality, focused almost exclusively on one question: did the Comptroller General belong to the Executive or the Legislative branch? *See Ameron, Inc., v. U.S. Army Corps of Engineers*, 787 F.2d 875 (3d Cir. 1986) (*Ameron I*). Little attention was paid at that time to the one aspect of CICA which allegedly crossed the forbidden line separating the two branches: that aspect, of course, is the "stay" provision of the statute, discussed in detail in Judge Becker's instant majority opinion. Maj.Op., at 985–986.

Writing for the original majority, I addressed the concern that the parties advanced as the crucial aspect of the appeal. I was satisfied that because no bright line separated the three branches of our government, we could find the power to sustain CICA and the functions of the Comptroller General by reference to those types of government agencies that combined two basic powers—the Legislative and the Executive. I felt then that the teachings of *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), permitted us to hold that the Comptroller held an office of a hybrid, independent nature— an office which did not transgress the separation of powers of our Constitution.

Judge Becker disputed the analysis of the majority that the Legislative and Exec-

utive powers could exist in a hybrid branch. Nevertheless, he agreed with the result we reached. He did so by examining the particular power given to the Comptroller General—to order a stay of the award or performance of the contract. He then determined in his concurring opinion, as he now determines in his majority opinion, that the particular power was so *de minimus* that it did not endanger the separation-of-powers principles.[1] All members of the original panel opinion thus concluded—albeit by different approaches—that CICA was constitutional and that the Army's challenge was meritless.

Thereafter, of course, the Supreme Court decided *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), which held that the Comptroller General was a legislative agent, and as such could not be a decisive actor in determining budget matters. *Bowsher* rejected clearly the analysis of the status of the Comptroller General to which the original majority in *Ameron* adhered. *Bowsher* required unequivocally that any separation of powers inquiry include an analysis of the removal power. *Bowsher* held unambiguously that because Congress retained removal authority over the Comptroller General, the Comptroller General was a legislative officer and therefore could not be entrusted with the executive powers that Congress granted him with respect to this nation's budgetary functions.

It should be noted, however, that *Bowsher* did not limit the holding of *Humphrey's Executor* that an agency such as the FTC could legitimately exercise hybrid authority. It left open the question as to whether other independent agencies should be permitted to perform duties for one or more branches while they remain independent of any. *Bowsher*, 106 S.Ct. at 3188 n. 4; *see also id.* at 3199 n. 11 (Stevens, J. dissenting). Nor, of course, did it diminish the vitality of *Nixon*'s instruction that "[I]n determining whether the Act disrupts the

---

**1.** To determine an acceptable level of intrusiveness, Judge Becker initially asked whether the challenged procedures "threaten to coalesce powers in one branch such that individual liber-

ty ... is threatened." *Ameron I*, 787 F.2d at 895. In light of *Bowsher*, he has retreated from that proposed standard. See Maj. Op., at 982, n. 2.

proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon,* 433 U.S. at 443, 97 S.Ct. at 2790.

We therefore come to the present proceeding with *Ameron I* and *Bowsher* as a backdrop. Here we must determine anew whether the separation of powers has been violated by CICA. Now that the Supreme Court has rejected the majority approach taken in *Ameron I,* Judge Becker's original analysis, which addressed the extent of intrusions by one branch into coordinate branches, appears to me a desirable way to resolve the constitutional challenge brought by the Army against the Comptroller General. In adopting that analysis, however, I do not include Judge Becker's original suggestion (since abandoned by Judge Becker) that the degree of instrusion was to be measured by threats to individual liberty. *See* Maj. Op., at 982 n. 2.

The central dispute no longer revolves around the issue of the Comptroller General's status. That issue has been resolved by *Bowsher* and is not open to question here. The only remaining question concerns the "stay" power that CICA grants to the Comptroller General.

Although Judge Becker's scholarly opinion for the majority explores a number of factors that may be germane to this determination, the answer to this question in the last analysis must turn on an assessment of the degree of the alleged intrusion into the authority of the coordinate branch. This is more of an *empirical* exercise in measuring the effect of the intrusion on the coordinate branch, than it is a *theoretical* exercise in questioning whether, in embryo, a dangerous violation of principle lurks beneath an apparently benign legislative mechanism.

Thus, in my view, the important distinction between this case and *Bowsher* is simple and clear. In *Bowsher,* the Comptroller General had the power to mandate budget cuts, enabling him, therefore, completely to usurp a function assigned to the Executive.

In the present case, however, the Comptroller General's power is limited—indeed, it may be characterized as almost trivial when compared with the power at issue in *Bowsher.* Here, the Comptroller General has only the fleeting and extremely limited power to stay a grant award or contract performance until an investigation has been completed.

On the same day that *Bowsher* was decided, the Supreme Court decided *Commodities Futures Trading Comm'n v. Schor,* —— U.S. ——, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). *Commodities* involved the question of "whether the Commodities Exchange Act empowers the Commodity Futures Trading Commission to entertain state law counterclaims in reparation proceedings, and if so, whether that grant of authority violates Article III of the Constitution." *Id.* 106 S.Ct. at 3249 (citation omitted). While *Commodities* is not directly analogous to the present case, it does speak directly to the issue of a *de minimus* intrusion which crosses separation-of-powers boundaries. That issue was left open in *Bowsher,* as I have noted. In my view, it is presented to us today.

The discussion in *Commodities* is best understood by a reading of *Commodities'* own language, which I quote:

> In such circumstances, the magnitude of any intrusion on the Judicial Branch can only be termed *de minimus....* Nor does our decision in *Bowsher v. Synar* require a contrary result. Unlike *Bowsher,* this case raises no question of the aggrandizement of congressional power at the expense of a coordinate branch. Instead, the separation of powers question presented in this case is whether Congress impermissibly undermined, without appreciable expansion of its own power, the role of the Judicial Branch.... In [reaching our result], we have also been faithful to our Article III precedents, which counsel that bright line rules cannot effectively be employed to yield broad principles applicable to all Article III inquiries.... We conclude that the limited jurisdiction that the

CFTC asserts over state law claims as a necessary incident to the adjudication of federal claims willingly submitted by the parties for initial agency adjudication does not contravene separation of powers principles or Article III.

*Id.* at 3261 (citations omitted).

Adhering to the teaching provided by *Commodities* leads me to the conclusion that whether the stay power is constitutional depends upon whether there is an "aggrandizement of power at the expense of a coordinate branch." 106 S.Ct. at 3261. The answer in each case will depend, of course, upon whether the extent of the intrusion at stake is permissible in terms of the *Commodities* test and is limited to that which is necessary to make an otherwise unobjectionable procedure workable.

Thus, in my opinion, examining the critical and challenged portion of the legislation, rather than the entire enactment itself, is a far more direct, more accurate and less arduous task than a reexamination of the whole of the unchallenged statute.[2] When I consider that there are many statutes which have given the Comptroller General responsibilities which may be deemed to cut across separation-of-power lines and which might therefore be attacked as the "stay" provision of CICA here has been challenged, it appears to me that the better analysis is one that focuses on the degree of intrusion that only the ostensible offending provision may cause.

If that intrusion is great, as it was found to be in *Bowsher,* then of course the statute itself may be held unconstitutional unless the provision in question can be corrected to conform to constitutional mandates. In *Bowsher* this would have re- quired only a change with respect to the power of Congress to remove the Comptroller General. *Bowsher,* 106 S.Ct. at 3188. If, on the other hand, "the magnitude ... of any intrusion on the [coordinate branch] can only be termed *de minimus,*" *Commodities,* 106 S.Ct. at 3260, then no correction of any part of the statute is required, and any attack upon the statute on the grounds of separation-of-powers principles will be fruitless.

Such an analysis would seem appropriate, for example, for the type of statutes listed in the brief of the Senate; these statutes delegate to the Comptroller General various functions which may be questioned as offending separation-of-power principles. That list is attached to this opinion as Appendix A. I attach it to draw attention to the number and variety of the Comptroller General's responsibilities under statutes which may well be affected by attacks similar to the Army's challenge to CICA here. I suggest that potential challenges, if made, are best resolved by the type of analysis I have proposed in this opinion.

In the present case, my analysis leads me to conclude that the stay power granted to the Comptroller General is not of such magnitude that it should be stricken as unconstitutional. By any test, I am content to hold that the very limited power granted to the Comptroller General under CICA does not undermine the role of the Executive Branch. Hence, upholding CICA's "stay" power does not in my opinion violate separation-of-powers principles.

I therefore concur in the result reached in the majority opinion.[3]

---

**2.** The majority, on the other hand, appears to believe that it is necessary to begin with an inquiry into the constitutionality of CICA as a whole. *See* Maj. Op., at 991–993, 993–995. To determine the constitutionality of the purposes of the entire Act *before* examining the questioned procedure itself (in this case, the Comptroller General's "stay" power) is, in my view, to prejudge the issue, since any view of the significance of the stay power must neces- sarily color the ultimate view of the purposes of the Act.

**3.** In so concurring I am in obvious agreement with the scope of the injunction originally modified in *Ameron I,* and now adopted by Judge Becker in *Ameron II.* See, Maj. Op., at 982, n. 1.

*APPENDIX A*

## AUTHORITIES OF THE COMPTROLLER GENERAL INDICATED BY THE SENATE AS POTENTIALLY AFFECTED BY BOWSHER v. SYNAR

### 1. *Claims settlement, generally*

| | | |
|---|---|---|
| 31 U.S.C. § 3702 | a. | The Comptroller General shall settle "all claims of or against the United States." |
| 31 U.S.C. § 3711(b) | b. | Only the Comptroller General can compromise a claim arising from an audit exception. |
| 2 U.S.C. § 130c | c. | Investigating applications for waiver of claims over $500 for erroneous payments to Vice President, a Senator or senate employee. Such claims may not be waived if Comptroller General takes exception to the account. |
| 31 U.S.C. § 3711(b) | d. | Resolves doubtful claims submitted by agencies if not over $20,000 each. |
| 31 U.S.C. § 3711(e) | e. | Prescribes claims collection standards jointly with the Attorney General. |
| 31 U.S.C. § 3531 (b)(2) | f. | The Comptroller General must charge appropriation accounts for losses and damage to United States property attributable to negligence of an official or agent of the agency. |
| 31 U.S.C. § 3526(a) | g. | The Comptroller General must supervise the recovery of all debts certified as due to the Government. |

### 2. *Account settlement*

| | | |
|---|---|---|
| 31 U.S.C. § 3526 | a. | The Comptroller General shall settle all accounts of the United States Government. |
| 31 U.S.C. § 3526(d) | b. | The balance certified by the Comptroller General is conclusive on the executive branch of the Government. |
| 31 U.S.C. § 3526(d) | c. | The Comptroller General may change the account within a year after settlement on his own initiative or on the request of an agency head. Any change he makes is also conclusive on the executive branch. |
| 31 U.S.C. § 3521(a) | d. | With the consent of the Comptroller General, the head of an agency (required to conduct an administrative audit of agency accounts before submitting them to the Comptroller General) may waive any part of the audit. |
| 48 U.S.C. § 1469 | e. | The Comptroller General must settle and adjust all disbursement accounts of appropriated funds to support governments of the United States territories. |
| 18 U.S.C. § 4126 | f. | The Comptroller General must settle and adjust all receipts and disbursements from the Federal Prison Industries Fund. No disbursements can be made from the fund without a warrant or certificate of settlement from the Comptroller General. |
| | g. | Panama Canal Commission. |
| 22 U.S.C. § 3712 (c)(2) | | (1) Before the Commission may receive an appropriation for any fiscal year, the Comptroller General must certify the accuracy of the Department of Defense's estimates of tolls likely to be collected and amounts likely to be needed. |
| 22 U.S.C. §§ 3712 (c)(2) and 3751(a) as amended by Pub. L. No. 98–63 | | (2) Before funds may be paid to the Republic of Panama, pursuant to Treaty obligations, the Comptroller General shall determine, on the basis of an annual validation audit, whether payments made to the Republic of Panama by the |

Commission accurately represent excess operating revenues over expenditures. Any overpayment he discloses must be refunded by Panama or offset against other payments due to Panama.

22 U.S.C. § 2221(d) h. Audits under Foreign Assistance Act of 1961, as amended.

> The Comptroller General must audit any fund established solely with United States contributions to make grants and loans to international organizations but which is administered by such international organizations pursuant to an agreement with the United States. If the Comptroller General finds that the funds are not being administered in accordance with the agreement, the President is required to modify the agreement to conform to the Comptroller General's findings and recommendations.

31 U.S.C. § 1556 i. Comptroller General reports on appropriation accounts. In connection with his general audit authority, the Comptroller General must report on the state of executive agency appropriation accounts, including an appraisal of unpaid obligations. By the 30th day after receiving the report, the agency must carry out whatever actions the report shows are necessary.

### 3. Advance legal decisions

31 U.S.C. § 3529 and
31 U.S.C. § 3526(b) A disbursing or certifying official or the head of an agency may request an advance legal decision about the propriety of making a proposed payment or certifying a particular voucher for payment. The Comptroller General must issue the decision requested. If the agency accepts the decision initially, the Comptroller General may deem the agency to have bound itself for future purposes.

### 4. Relief authorities

31 U.S.C. § 3527 a. The Comptroller General is the only government official who can relieve a present or former accountable officer from liability for a physical loss of money, or for an illegal, improper, or incorrect payment from his account. Except for physical losses in accounts of disbursing officers in the Armed Services, such determinations are binding on all executive branch agencies.

31 U.S.C. § 3527(c) b. The Comptroller General may deny relief if he finds that the head of the agency did not diligently carry out collection action under procedures prescribed by the Comptroller General.

31 U.S.C. § 3528(b) c. The Comptroller General may relieve certifying officers from liability for improperly or illegally certifying a voucher for payment, when he finds that certain statutory criteria have been met.

31 U.S.C. § 3528(c) d. The Comptroller General may relieve a certifying official from liability for overpayments to common carriers when certain specified conditions are met.

### 5. Prescribing accounting standards or procedures

31 U.S.C. § 1112
(c)(1) & (d) a. The Comptroller General must establish, maintain and publish standard terms and classifications for use in providing fiscal, budget and program informa-

 tion about agency activities. Agencies are required to use the Comptroller General's terms and classifications when they report on their programs to the Congress.

| | | |
|---|---|---|
| 31 U.S.C. § 3511(a) | b. | The Comptroller General shall prescribe accounting principles, standards, and requirements which the head of each executive agency shall observe. |
| 31 U.S.C. § 3512 (e) & (f) | c. | The Comptroller General is authorized to review, and to approve the accounting systems of each executive agency when he finds they conform to his prescribed principles, standards, and requirements. |
| 31 U.S.C. § 3513(c) | d. | The Comptroller General shall review, and approve the reporting and accounting system in the Department of the Treasury when he finds that it conforms to his requirements. |
| 31 U.S.C. § 3521(b) | e. | The Comptroller General may prescribe the maximum amount of a voucher that may be audited under a statistical sampling procedure. |
| 31 U.S.C. § 3530 | f. | The Comptroller General may prescribe regulations to adjust appropriation accounts for a loss of funds attributable to accountable officer negligence. |
| 31 U.S.C. § 3522 (a)(1) | g. | Disbursing officials may submit their accounts quarterly unless the Comptroller General decides that the public interest requires more frequent submissions. |
| 22 U.S.C. § 283j-1 | h. | Inter-American Development Bank. The Comptroller General must prescribe for the Secretary of the Treasury the scope of and the auditing and reporting standards which the Executive Director of the Inter-American Development Bank must follow. |
| 22 U.S.C. § 2221(e) | i. | The Comptroller General must prepare auditing and reporting standards in connection with his audits of United Nations and affiliated agencies, International Bank for Reconstruction and Development, Asian Development Bank, and the International Atomic Energy Agency. These standards must be incorporated in any proposed agreement the President makes with these entities. |
| 47 U.S.C. § 396(l) (4)(A) | j. | Corporation for Public Broadcasting. The Corporation may not distribute any funds to National Public Radio unless it can determine that NPR is implementing a system of financial controls and procedures recommended by an independent C.P.A. (which system the Comptroller General has determined complies with generally accepted accounting principles and which reflect prudent management practices). |
| 42 U.S.C. § 300x-5 | k. | State audits of community health center grants from HHS must comply with the Comptroller General's standards for audits of government agencies and organizations. |
| 31 U.S.C. § 7501 et seq. (new) | l. | State and local assistance programs—must be audited in conformance with the Comptroller General's generally accepted auditing standards. |
| 31 U.S.C. § 6723 (a)(1) | m. | State Revenue Sharing programs—must also be audited in conformance with the Comptroller General's generally accepted auditing standards. |
| 31 U.S.C. § 3523 (c)(1) | n. | Records retention—the Comptroller General may require agency records to be retained under conditions and for a period of not more than 10 years (unless |

the Comptroller General and the head of the agency agree to a longer period).

## 6. *Participation in decision-making as member of independent boards and commissions*

Current memberships include: Railroad Accounting Principles Board (49 U.S.C. § 11161 et seq.); U.S. Railway Association Board of Directors (45 U.S.C. § 711); Technology Assessment Advisory Council (2 U.S.C. § 476); and a board to arbitrate disputes about price, quality, suitability etc. of prison-made products, decisions of which are binding on Federal agencies required to buy the products. (18 U.S.C. § 4124).

## 7. *Davis-Bacon Act Determinations*

40 U.S.C. § 276a–2 The Comptroller General is required to make Davis-Bacon Act determinations about a contractor's liability for failing to pay laborers and mechanics required level of wages, followed by decision to debar the contractor from participating in further Government contracts for a period of 3 years.

## 8. *Countersigning Warrants*

31 U.S.C. § 3323 The Comptroller General is required to countersign warrants before the Secretary of the Treasury may pay the various agencies their share of appropriated funds.

## 9. *Reasonable Price Determination*

DOD Authorization Act, Pub.L. No. 99–145, 99 Stat. 725 The Comptroller General must determine the reasonable price of uranium tetrafluoride (used to produce conventional ammunition) in order to enable the Secretary of the Army to make required certifications to the Congress, which is a prerequisite to providing the uranium to contractors from stockpile materials.

## 10. *Impoundment Suits*

2 U.S.C. § 687 The Comptroller General is "expressly empowered" to bring a civil action in the United States District Court for D.C. against any department, agency, or officer to require him to make budget authority available for obligation which, in his view, should not have been impounded.

## 11. *Verification Examinations of Energy Information*

42 U.S.C. § 6382 (a)(1) The Comptroller General has authority to issue subpoenas to produce books and records, compel attendance of witnesses, and require written answers to his interrogatories in connection with his duty to conduct verification examinations of information furnished about energy resources.

The Comptroller General may assess civil penalties of up to $10,000 for each violation of an order to produce information.

The Comptroller General has authority to obtain enforcement of his subpoenas or orders in a United States District Court.

## 12. *Certifications of judgments, awards, and compromises for payment from the judgment fund*

31 U.S.C., generally The Comptroller General may refuse to certify judgments, awards and compromises if he finds that the requirements of the law, both as to the underlying judgment and/or a claim for interest, have not been met.

## 13. *Procurement Protest System under Competition in Contracting Act*

31 U.S.C. § 3551 et seq. a. Protests by contractors alleging a violation of procurement statutes or regulations shall be decided by

the Comptroller General within specified time limits. The decision may contain recommendations to the agency, but they are not binding. Nevertheless, the agency is not allowed to proceed with making its award until the Comptroller General's decision has been issued unless it makes a written finding that "urgent and compelling" circumstances will not permit the delay.

31 U.S.C. § 3554(c) b. The Comptroller General may determine that the solicitation for a contract or proposed award doesn't comply with a statute or regulation and declare the interested party to be entitled to the costs of filing and pursuing the protest, including attorney fees, and bid and proposal preparation costs. Federal agencies are required to pay such monetary awards promptly out of available funds.

14. *Form and content of information provided to Congress*

31 U.S.C. § 1113(b) The Comptroller General can require OMB and heads of executive agencies to provide to the Congress fiscal, budget, and program information, including summary tables and whatever related information the Comptroller General thinks is necessary.